In the Matter of the Rehabilitation of LAWYERS MORTGAGE COMPANY.

Supreme Court, Additional Special Term, New York County, July 7, 1937.

*Harry Rodwin*, for the Superintendent of Insurance.

*Jacob L. Holtzmann*, special counsel for the Mortgage Commission of the State of New York.

*Leon Leighton*, for various certificate holders.

*M. H. Blinken*, for R. F. Oppenheim and others.

*Thomas Keogh,* for various certificate holders.

*Cullen & Dykman* [*Ralph W. Crolly* and *Edward Endelman* of counsel], for the Brooklyn Trust Company.

*Wingate & Cullen* [*Anthony J. Sessa* of counsel], for the City Bank Farmers Trust Company and the National City Bank of New York, as trustees, etc.

*James S. Kleinman,* for Lena Shepatowski, a certificate holder.

*Leon London,* for Hannah Glifberg and others.

*Marshall, Bratter & Seligson,* for various certificate holders.

*Paul E. Mead* [*Oscar B. Lowman* of counsel], for the Irving Trust Company, as trustee.

*Mitchell, Taylor, Capron & Marsh,* for the City Bank Farmers Trust Company.

*Guggenheimer & Untermyer* [*Jacob Harris* of counsel], for various certificate holders.

*Walker & Redman,* for George R. Walker.

*Barney Podell,* for various certificate holders.

*Merchant, Alena & Flagg* [*D. R. Santomenna* of counsel], for certificate holders.

*Kleban & Bernstein,* for Fay Kane and others.

*Wayland & Bernard* [*Robert W. Bernard* and *Caesar Nobiletti* of counsel], for the Brooklyn and Queens Young Men's Christian Association.

*M. E. Hall,* for Henry T. Sloane, certificate holder.

*Bertram L. Marks,* for the trustees of the estate of William Manger, deceased.

*Rapaport Brothers* [*Henry N. Rapaport* of counsel], for various certificate holders.

*Edward Endelman,* for various certificate holders.

*Evarts, Choate, Curtin & Leon,* for various certificate holders.

*Wagner, Quilliman & Rifkind* [*S. H. Rifkind* of counsel], for Kraemer and others.

*Winthrop, Stimson, Putnam & Roberts* [*George Roberts* of counsel], for the Protective Committee of Stockholders of the Lawyers Mortgage Company.

*Cabell, Ignatius & Lown* [*Milton B. Ignatius* and *Joseph Dempsey* of counsel], for the committee membership consisting of Mortimer N. Buckner and others.

*Pollock & Nemerov* [*M. J. Dix, Joseph A. Gluckman* and *M. L. Rattner* of counsel], for certificate holders.

*George M. Jaffin,* for the Louise B. Belknap Trust and others.

*Juhl, McGarry & Burg,* associate counsel for the Creditors Protective Committee of the Lawyers Mortgage Company.

*Weinstein & Levinson,* for the Creditors Protective Committee of the Lawyers Mortgage Company.

*Reeves, Todd, Ely & Beaty* [*Madison Marine* of counsel], for various certificate holders.

*Rumsey M. McGregor,* for the Bank of New York and Trust Company.

*Howard L. Kuttner,* for the New York Retail Grocers Association.

*Oscar L. Foley,* for E. B. Southworth, Jr., certificate holder.

*Wilson, Huntington & Lord,* for L. E. Hampton, certificate holder.

*Kramer & Kleinfeld* [*B. Kaprow* of counsel], for various certificate holders.

*Sylvester & Harris,* for the Brentmore Estates, Inc.

FRANKENTHALER, J.   This is a motion by sixteen attorneys, or firms of attorneys, representing various creditors of Lawyers Mortgage Company, for confirmation of the report of Hon. James A. Martin, referee, and approval of a plan for the reorganization of the company recommended by the referee.

By order of this court, dated March 17, 1936, the referee was appointed " for the purpose of conducting hearings upon the plan proposed by said Creditors' Committee and such modifications and amendments thereof or other plans as may be submitted for consideration, for the purpose of determining the fairness, equitableness and adequacy thereof."   Notice of the first hearing was given to all creditors, policyholders, certificate holders, stockholders and other persons interested in the affairs of Lawyers Mortgage Company.   During the course of the hearings twenty-three different proposed plans of reorganization were submitted on behalf of various creditors and stockholders and numerous amendments and modifications of the plans were presented and considered. Fifteen public hearings were held at which all interested persons were given every opportunity to be heard.   At the first hearing almost one thousand persons appeared.   A great deal of testimony was taken, the record consisting of 991 pages, together with seventy exhibits and the twenty-three proposed plans of reorganization with amendments and modifications.   The attorneys who appeared at

the hearings organized themselves into a "conference" for the purpose of informal exchanges of views in respect of the numerous plans and amendments, with the object of reducing the many points of difference to a minimum. Another advantage of the "conference" was that it enabled its members to conduct negotiations with stockholders' representatives in a manner which greatly simplified the proceedings before the referee. Frequent oral reports of the progress of the negotiations were submitted to the referee. The latter held innumerable meetings with attorneys for the Superintendent of Insurance, the Mortgage Commission, and various creditors and stockholders, for the purpose of reaching an accord upon those matters which had not been agreed upon in the discussions between the group of attorneys previously referred to and the other parties in interest. It is, indeed, a tribute to the ability and personality of the learned referee that a plan of reorganization has been worked out under his guidance and through his efforts, which, except in a few minor details, meets with the approval of practically all the various parties in interest who participated in the proceedings or who appeared at the hearing of the present application for confirmation of the referee's report and approval of the plan recommended therein.

As the referee's report, including the proposed plan, consists of 134 printed pages, it is obviously impossible within the limits of a judicial opinion to do more than outline the main features of the plan and its outstanding advantages. The avowed objectives of the plan are: (1) Payment of the claims of creditors of Lawyers Mortgage Company as speedily as possible, to the extent that the assets of the company permit, by means of an efficient, economical and timely realization upon such assets; (2) continuation by the Lawyers Mortgage Guarantee Corporation, organized by the Superintendent of Insurance in 1933 and hereinafter referred to as the "operating company," of the business of the mortgage company to such extent as may be permitted by law, including the efficient servicing of guaranteed mortgages and certificates, the refinancing, wherever feasible, of said outstanding mortgages and certificates, and such other phases of the mortgage business as may be profitably conducted in a sound and conservative manner; and (3) giving to the creditors and stockholders of Lawyers Mortgage Company an opportunity to share in any profits derived from the continuation of the operating company. The plan expressly contemplates that the holders of guaranteed mortgages and certificates are to retain possession, ownership and control of them and contains no provision which in any way affects such possession, ownership and control. It is, however, the belief and hope of those who have

worked out the plan that it will be to the advantage of holders of mortgages and certificates guaranteed by Lawyers Mortgage Company to have the same serviced by the operating company, and it is anticipated that the servicing of such mortgages and certificated issues as may be profitably handled by the operating company will in numerous instances be turned over to it.

In order to effect the reorganization contemplated by the plan in an expeditious, efficient and economical manner, provision is made for the designation of four reorganization managers, who are to be charged with the duty of obtaining assents to the plan and of supervising the various steps necessary for its consummation. Three of the reorganization managers are to represent creditors and are to be appointed by the court, while the fourth, who is to represent stockholders, is to be designated, subject to the court's approval, by the Protective Committee of Stockholders of Lawyers Mortgage Company. As the first step in the reorganization, the reorganization managers, immediately upon their qualification, are to request the Superintendent of Insurance to apply for an order of liquidation of Lawyers Mortgage Company in which the time for filing claims is to be made as short as possible. The order of liquidation is to refer to the fact that the liquidation represents the first step in the reorganization of the company and is to provide for the continuation of the court's jurisdiction over the reorganization managers, the reorganization plan and the reorganization proceedings until their ultimate consummation.

In accomplishing the purposes of the plan, two corporations are to be utilized: (1) Lawyers Mortgage Guarantee Corporation, which is to operate as a mortgage company, and (2) a " realization corporation " which is to be organized for the purpose of administering the assets of Lawyers Mortgage Company and realizing as much as possible from them. The present assets of Lawyers Mortgage Guarantee Corporation are to be reduced to $1,000,000 in cash plus its servicing contracts, and its capital stock is to be reclassified so as to consist of 340,000 shares of common stock of the par value of five dollars each. One hundred and sixty thousand shares are to be issued to the Superintendent of Insurance in return for the assets and servicing contracts left with the company, and are to be exchanged by him for voting trust certificates to be issued by voting trustees who are to manage the affairs of the operating company. These certificates are to be distributed among the creditors, whose claims are to be reduced six dollars and twenty-five cents for each share or certificate, or are to be purchased by the reorganization managers for the benefit of assenting creditors at the same price. Non-assenting creditors who elect to receive cash

in lieu of voting trust certificates are to be entitled to do so. One hundred and sixty thousand shares of capital stock of the operating company are to be subscribed for by stockholders of Lawyers Mortgage Company at a price of six dollars and twenty-five cents per share and voting trust certificates are to be issued to the subscribers. The remaining twenty thousand shares of the operating company's stock are to be reserved for allotment to officers and employees of the operating company, to be issued to them at such times and upon such terms as the directors may from time to time determine, but at not less than six dollars and twenty-five cents per share. The affairs of the operating company are to be managed and controlled by five voting trustees, three to be appointed by the court and two to be designated by the Protective Committee of Stockholders of Lawyers Mortgage Company, subject to the court's approval. The reclassification of the stock of the operating company and its exchange for voting trust certificates is to be accomplished by the Superintendent of Insurance prior to the effective date of the plan, if possible, but, in any event, prior to the sale of the assets of Lawyers Mortgage Company in bulk in accordance with the provisions of the plan presently referred to.

After the plan shall have been declared effective and after a sufficient number of claims filed in the liquidation proceeding shall have been allowed so as to indicate with reasonable certainty the total amount of claims finally to be allowed against Lawyers Mortgage Company, the reorganization managers are to request the Superintendent of Insurance to apply for an order authorizing the sale, in bulk or otherwise, of the assets of Lawyers Mortgage Company (except the capital stock of the operating company or the voting trust certificates representing same) at a price and on terms satisfactory to him and approved by the court. The plan contemplates that the reorganization managers are to bid such an amount as they deem proper, but not to exceed a sum sufficient to pay in full the aggregate of all claims theretofore filed and allowed, plus an approximation of the amount estimated to be allowed on the balance of the filed claims, together with interest on the total at six per cent per annum, plus a certain differential between the price paid by the reorganization managers for the stock or voting trust certificates of the operating company and the sum of $1,000,000, the details of which need not be discussed here. The reorganization managers are to pay the amount bid by them for the purchase of the assets by applying claims of creditors, which are to be assigned to them by assenting creditors in accordance with the provisions of the plan, at their dividend or distribution value. The assets thus acquired by the reorganization managers are to

be transferred to a new corporation which is to hold and administer them, said corporation being hereinafter referred to as the " realization corporation." If the assets are acquired by outside bidders and the amount realized from the sale is more than sufficient to pay creditors their allowed claims in full, together with interest thereon at six per cent per annum, the surplus shall be distributed in accordance with article XI of the Insurance Law, with certain minor qualifications unnecessary to mention here. In the event the assets are not acquired by the reorganization managers, the provisions of the plan with respect to the realization corporation are not to be operative, the purposes of the plan in regard to the realization corporation being satisfied if creditors receive full payment of their claims with interest. Futhermore, the Superintendent of Insurance is not to be required to make a sale of the assets of Lawyers Mortgage Company if its stockholders deposit with him cash sufficient to pay all claims in full with interest. The stockholders are, however, not to be given an opportunity to make such a deposit until the stock of the operating company shall have been distributed to assenting creditors and assenting stockholders, it being the purpose of the plan to protect creditors against the possibility that stockholders, by paying the claims in full, with interest, at some future date, may deprive creditors of all participation in the affairs of the operating company, which is to continue, as far as practicable, the mortgage business formerly conducted by Lawyers Mortgage Company.

If the assets of Lawyers Mortgage Company are purchased by the reorganization managers, the realization corporation, after acquiring the assets, is to issue to each assenting creditor a participation certificate evidencing his right to share in the assets of said corporation, such certificate to be in the amount of his claims finally allowed in the liquidation proceeding, less his *pro rata* share of the capital of the operating company paid in by assenting creditors at the rate of six dollars and twenty-five cents per share, as previously mentioned. The realization corporation is to administer the assets acquired by it and to liquidate them in an orderly and business-like manner, having due regard for the present depressed condition of the real estate market, so as not to sacrifice the interest of creditors and stockholders but rather to yield to them as large a return as possible. The net proceeds of the liquidation by the corporation are to be applied to the payment of the participation certificates in full, together with interest thereon at the rate of six per cent per annum from the date of the entry of the order of liquidation. Any surplus after full payment of such participation certificates, with interest, is to be distributed

substantially as follows: (1) Fifty per cent to assenting creditors, ratably, by distributions to the holders of participation certificates; (2) twenty-five per cent to assenting stockholders, ratably, who subscribe and pay for capital stock in the operating company; and (3) twenty-five per cent to assenting stockholders who do not subscribe to the capital stock of the operating company. The affairs of the realization corporation are to be managed and controlled by three realization agents appointed by the court, two to represent assenting creditors and one to represent assenting stockholders. The realization agents are to be voting trustees of the stock of the realization corporation, pursuant to a voting trust agreement to be entered into.

Creditors assenting to the proposed plan of reorganization are to execute instruments evidencing such assent and assigning to the three reorganization managers representing them their claims against Lawyers Mortgage Company, each assenting creditor reserving the right, however, to prove and prosecute his claim in the liquidation proceeding, should he desire to do so. Assenting stockholders are to execute instruments evidencing such assent, empowering the reorganization manager representing them to represent their interests in the liquidation proceeding, and assigning to him any dividends or proceeds payable to them in the liquidation proceeding to the extent necessary to carry out certain features of the plan which need not be discussed here. Creditors holding claims entitled to priority in payment are to be paid as the nature of the claims requires. Non-assenting creditors and stockholders are to be barred from participation in the plan and their rights are to be determined in the liquidation proceeding pursuant to article XI of the Insurance Law. In other words, non-assenting creditors are to receive payment of their allowed claims to the extent permitted by the total amount realized from the sale by the Superintendent of Insurance of the assets of Lawyers Mortgage Company in the liquidation proceeding, plus the value of the assets left in the operating company by the Superintendent of Insurance. If there is any surplus after all allowed claims have been satisfied, non-assenting stockholders are to share in it in proportion to their holdings. It should be borne in mind, however, that there will be no such surplus if the reorganization managers are the successful bidders at the sale.

No fees or allowances are to be paid for counsel to creditors, stockholders, or creditors' or stockholders' committees, unless the plan shall be declared effective, and in that event, only in such amounts as the court may approve upon appropriate notice. When, in the opinion of the reorganization managers, a sufficient number

of creditors and stockholders shall have assented to the plan, so as to render its consummation feasible, the reorganization managers shall apply to the court for an order declaring the plan effective. In no event, however, is such application to be made unless either the holders of two-thirds in amount of all outstanding guaranties shall have assented to the plan or unless holders of approximately two-thirds in amount of the estimated allowable claims shall have assented thereto.

Certain features and aspects of the proposed plan merit brief discussion. The plan calls for the consummation of the reorganization through the medium of a liquidation proceeding because until the recent approval by the Governor of a bill authorizing reorganizations hereinafter referred to, the only statute which permitted the effective reorganization of the company was article XI of the Insurance Law, in so far as it provides for liquidation of the insurers subject to its provisions. To quote from the referee's report (pp. 66, 67): "That Article contains provisions for the determination of claims of creditors, and through such determination permits of the effective dealing with non-assenters, the freeing of the Company from accruing liabilities and from unknown and unpresented claims and such disposition of the assets as may be required by a plan. The Article thus contains the machinery necessary to accomplish reorganization."

No reorganization could be accomplished in the pending rehabilitation proceeding, in view of the fact that the provisions of sections 424 and 425 of the Insurance Law for the filing, proof and determination of claims apply only to liquidation proceedings (*Matter of Bond & Mortgage Guarantee Co.*, 271 N. Y. 452). "Only through a liquidation proceeding, therefore, can the company be freed from continuing liabilities and from unknown and unpresented claims. Unless one hundred per cent of the creditors and stockholders consent to a plan, it is clear that provision must be made for protecting the rights of non-assenters. The distributive share of non-assenters in the assets of the company can be ascertained only if claims are filed and determined. Since under the statute machinery for filing and proving claims of creditors exists only in a liquidation proceeding, it seems clear that such proceeding must be utilized in order to measure the rights of non-assenters and to make appropriate provision therefor. Another objection to reorganizing the company in a rehabilitation proceeding and not through the medium of a liquidation proceeding, is that the Superintendent, as rehabilitator, may, during the pendency of the reorganization, be compelled by then existing circumstances to make application for a liquidation order. Obviously, the Superin-

tendent, as rehabilitator, could not be precluded from the performance of his statutory duty in making application for a liquidation order if the circumstances warranted such an application." (Referee's report, pp. 67, 68.)

As the determination of the amounts to be allowed to creditors upon their respective claims against the company must necessarily await the order of liquidation, the expiration of the time for filing claims, and the final adjudication of all the claims, it was obvious that no plan of reorganization could become effective in the immediate future if its effectiveness were dependent upon the definite ascertainment of the amounts finally allowed upon claims in the liquidation proceeding. For this reason the plan provides that it may be declared effective if holders of two-thirds in amount of all outstanding *guaranties* shall have assented to the plan or if holders of *approximately* two-thirds in amount of the *estimated allowable claims* shall have assented thereto. Of course, the provisions in the plan regarding the participation of creditors in the reorganization cannot and do not affect the determination of the claims of creditors in the liquidation proceeding, the rights of the creditors being fixed by the provisions of article XI of the Insurance Law.

The provisions of the plan for payment to assenting creditors of their allowed claims as soon as practicable, to the extent that the assets permit, are attributable, in part at least, to recognition of the fact that numerous mortgages and certificates guaranteed by Lawyers Mortgage Company are held by savings banks, insurance companies, trust companies, charitable institutions and trustees who " do not all possess equal freedom of action with respect to a proposed plan of reorganization, either because of economic or legal limitations thereon, or because their conduct is conditioned by general policy. For instance, there are individual holders of mortgages and certificates who because of their financial necessities would be prevented from consenting to a plan which would defer cash payments to them. On the other hand, there are other individuals who would be willing to forego prompt cash payments and to await, instead, other benefits accruing under a plan. Similarly, fiduciaries may be limited under their respective grants of power from consenting to a plan which would not provide for cash payments and which would defer all receipts of cash to an indeterminable future time." (Referee's report, pp. 68, 69.)

The question of participation of stockholders in the proposed reorganization was complicated by the fact that it is impossible at this time to determine whether or not they have any present

equity in Lawyers Mortgage Company. The referee has very aptly pointed out, however, that, regardless of whether the stockholders possess any present equity in the company, their participation and co-operation in the reorganization is, nevertheless, desirable: "The cooperation of stockholders in the reorganization process will probably avoid prolonged and expensive litigation that would otherwise ensue. The cooperation of stockholders will help insure promptness in the entry of the liquidation order, the determination of claims and the valuations of underlying collateral. In addition, their cooperation will be a most valuable asset to the future operations of the reorganized company. Hence, any reorganization plan which contemplates the consent and cooperation of stockholders, to be feasible, should make equitable provision for their participation on terms assuring them, as well as creditors, their legal rights as ultimately determined." (Referee's report, p. 70.)

By providing that creditors and stockholders will participate in the reorganized company and share in its assets upon the basis of claims as ultimately fixed by the courts, the plan operates with equal fairness to all parties in interest, regardless of the formula which may ultimately be adopted by the courts in regard to the proving and allowance of claims. By providing for the setting up of the reorganized operating company as soon as the number of assents to the plan warrants this step, the plan accomplishes the aim of promptness. By separating the realization process from the functioning of the reorganized operating company and by providing for the payment to creditors of the proceeds of the assets as they are realized, deducting only the investment which assenting creditors make in the operating enterprise, the plan frees the assets for the payment of creditors and at the same time frees the operating company from the liabilities of Lawyers Mortgage Company. By providing that assenting creditors and stockholders agree upon a fixed price for the stock of the operating company the plan offers strong inducement to these persons to join in it. By offering fair terms of participation to stockholders it seeks to obtain the continued activity in the affairs of the reorganized company of its present stockholders, officers and directors, and by fostering such continued operation it offers advantages to creditors. The provision for reorganization managers to carry the plan into effect is designed to accomplish a task which obviously cannot be borne by any other individuals or groups, particularly in view of the fact that the referee has found that in the case of Lawyers Mortgage Company no single committee or group is in a position of dominance or control. The provisions of the plan relating to the distribution

between creditors and stockholders of any surplus remaining in the realization corporation after payment of the participation certificates issued by said corporation, with interest thereon, appear to be fair and equitable: " If after all participation certificates are paid in full a surplus remains in the Realization Corporation then such surplus will be divided one-half to assenting creditors and the other one-half to assenting stockholders. The one-half which goes to assenting stockholders is divided between those stockholders who merely assent to the Plan and those who, in addition to assenting to the Plan, subscribe to the stock of the operating company.

" It is fair that such distribution of surplus be made between creditors and stockholders. Creditors are entitled thereto because such surplus may well result, at least in part, from their forbearance and willingness to allow assets to be administered and realized upon over an extended period of time. Assenting stockholders likewise are entitled to participate in a surplus which exists after creditors shall have been paid in full. The stockholders are cooperating in the Plan by (a) consenting to the transfer of assets to the Realization Corporation, as promptly as possible; (b) relinquishing whatever right they have or might otherwise assert to require the Superintendent to administer the assets as a statutory liquidator; and (c) consenting to an immediate order of liquidation. Hence, it is only fair that both groups participate in any surplus which may result in the realization process.

" The further division of the assenting stockholders' portion of the surplus between those who subscribe to the operating company stock and those who do not so subscribe is justified. It is entirely proper that some participation in the surplus be given to stockholders who cooperate and assent to the Plan regardless of whether or not they can, or see fit to, invest new money in the operating company. It is likewise advisable to give an additional participation to those stockholders who not only assent to the Plan but also invest new money in the new enterprise." (Referee's report, pp. 85, 86.)

The minority representation given to the assenting stockholders in the control of the realization corporation is based upon the fact that they will have an interest in the proceeds if the assets realize more than enough to pay creditors' claims in full.

In recommending the proposed plan to the court for approval the referee aptly points out that it is not submitted as the only fair and equitable plan of reorganization which may be formulated for Lawyers Mortgage Company. He states (Referee's report, pp. 89, 90): " In a situation of this type where assets are of great value but their exact value must be established by actual administration over

a period of years and where the future earning capacity of the reorganized company is a matter of opinion rather than of demonstrable proof, it is impossible to formulate any readjustment which can be mathematically proven to be the exact balancing of rights and equities.  There can be no showing that only a single method of readjustment is fair and equitable and that every deviation therefrom is necessarily unfair and inequitable.  All that can be reasonably contended is that the submitted Plan constitutes a fair and equitable treatment of the rights of creditors and stockholders. * * *  It provides for creditors and stockholders whether they assent to the Plan or not.  Those creditors and stockholders who join in the Plan receive the benefits that accrue from the future operations of the reorganized company and a conservative and businesslike realization upon the present assets.  Those creditors and stockholders who do not assent receive their legal and statutory rights as under a statutory liquidation proceeding.  The Plan is therefore fair because it operates equitably among the creditors and stockholders assenting thereto and because it does not discriminate unfairly against those who do not assent."

At the hearing of the application to confirm the referee's report and approve the plan recommended by him no opposition to the plan as a whole was voiced by any one, and only a very few modifications were suggested.  One attorney proposed that the plan be modified so as to provide that it is not to become effective unless the required number of assents are obtained within a specified time, and another that the plan be modified so as to provide that assents are to be void and of no effect unless the transfer of the assets to the realization corporation shall take place on or before a specified date.  Since the hearing the first suggestion has been withdrawn. As to the second, until the transfer of the assets they remain with the Superintendent of Insurance with whom they would remain if no plan of reorganization were adopted and consummated.  No prejudice to creditors or stockholders can, therefore, result from the failure of the plan to fix a definite time within which the transfer of the assets from the Superintendent to the reorganization managers or the realization corporation must be accomplished.

The only other suggestion in regard to the proposed plan which merits discussion is that made by counsel for a creditors' committee upon whose petition the present reorganization proceeding was originally initiated.  Although the said committee approves of the general principles of the plan recommended by the referee, it proposes that the plan give the creditors the right " to select the voting trustees and others who are to act for them."  Some of the disadvantages of this proposal are well expressed in the following

statement made by counsel for certain of the creditors at the hearing: " Now you take one of these fifteen hundred under $2,000 creditors and tell him that he can select a board of directors. * * * How can he select a board of directors? First of all, he has not enough at stake to justify his devoting real time to an examination of the candidates; he does not know the people who are available — the real people, the kind of people who should be appointed are not the people who are willing to make themselves candidates — with the result that you have candidates of those who are willing and are looking for the perquisites of office but who are made of the kind of stuff so that when the ship lists a little bit they look for the rat-hole and exculpation of the indenture to make their escape; they are not there to run the ship. Whereas what we want are people who are going to stay and man this situation through. And we are not in a position to select them, we are not in a position to corral any real people and say: ' You take it ' and he will say ' Well, how do you know I will have it? Maybe some other fellow is going to run a circular through the mails and is going to induce them to vote for somebody else. I am not going to be made a target of a political campaign. I am a business man.' It is quite different when this Court calls upon a citizen to serve in a trust capacity under its jurisdiction. That is pleasant. That is a post of honor. That is a post of responsibility, and this Court has been able to command the services of people that the creditors in their own search could never have commanded. They would not have any possibility of securing the services of men of such calibre because they could not have protection, have appointment, without the inconvenience, the dissatisfaction and the ugliness of election. * * * We had a few elections in this Borough until we learned and realized that the creditors do not want an election. Their election is when they vote for this plan, and then they say, ' We vote for the proposition that this Court shall appoint the men who are going to run this property.' That is a democratic expression of their views. The other is just a shibboleth, it is just a wisp of wind, it doesn't mean anything; it is nothing but a proposition to befuddle those who do not understand and to give those who do an opportunity to find something for themselves that they are not able to find or obtain."

Similar views were expressed by others, one of whom stated: " From past experience we know that where the Court appoints trustees, such trustees have assumed their duties efficiently and have performed their duties remarkably well and to the best interest of all certificate holders."

Counsel for the Mortgage Commission, in approving of the plan recommended by the referee, stated: " The Commission feels that

this plan will never be one that will be fair to all certificate holders, to all of the creditors unless the power of starting off this company, of naming those who shall be the first sponsors, who shall be the first group to manage this company is vested in your Honor. * * * We express it as an opinion that it is the overwhelming view of the certificate holders that their interest will best be served by having this Court take on the responsibilities of naming these who shall start this enterprise. * * * This thing has our blessings completely. We hope that it will go through. We do not think it has a chance of going through if you are going to leave the naming of the voting trustees or reorganization managers or realization managers to any group of certificate holders * * * I do know that if one committee goes out and campaigns that others will feel free to do likewise, and the result will be that you will have an unseemly scramble for something, and that you will have men clamoring for offices, not so much for the opportunity to serve, but perhaps for the perquisites, or for the things that go with election to those offices. We say that if you want to be sure to lose the approval of the certificate holders, then allow the socalled democratic method of election."

In addition to receiving the approval of the Mortgage Commission and of the creditors generally to the extent that their views were expressed at the hearing, the plan also meets with the approval of counsel for the stockholders' protective committee. The latter, after stating that he thought it was " a great achievement of the referee, that he has succeeded in getting from the numerous groups of lawyers represented at the conference before him, a substantial agreement on the plan," and after pointing out that the plan was not as favorable from the standpoint of the stockholders as he would have liked, stated definitely that the stockholders' protective committee consented to and approved of the plan, and concluded as follows: " It is a marvel that we have been able to get a plan which we can come with to your Honor and submit for your approval with practical unanimity. The responsibility that it places on you in determining the various personnel who will control, the selection of the directors of the new operating company, the selection of reorganization managers, and the selection of the realization agents is, of course, enormous. Speaking for the stockholders, we have entire confidence that that selection which I hope will be announced in the order approving the plan, will be satisfactory to every one."

As the proposed plan is, in the opinion of the court, fair and equitable to all concerned, and as it meets with the practically unanimous approval of all who have indicated their views, the

motion to confirm the referee's report is granted and the plan approved. The reorganization managers will be named in the order to be entered hereon. The designation by the protective committee of stockholders of the reorganization manager who is to represent the stockholders, subject to the court's approval, will be received upon the settlement of the order.

The suggestion, previously referred to, that the court name at this time the persons who are to be appointed voting trustees for the operating company and the realization corporation is hardly a feasible one. Unless the proposed plan receives the approval of a sufficient number of creditors to enable it to become effective there may never be any voting trustees for either the operating company or the realization corporation. Even if the plan is approved by the requisite number of creditors, it is possible that the highest bidder for the assets of Lawyers Mortgage Company at the sale conducted by the Superintendent of Insurance will be some one other than the reorganization managers. This possibility may not be a remote one if the " real estate " rather than the " mortgage " formula should ultimately be adopted by the Court of Appeals for the valuation of claims against mortgage guaranty companies in liquidation. (*Matter of New York Title & Mortgage Co.*, 161 Misc. 564; affd. by a divided court, 251 App. Div. 415.) In such event no realization corporation will ever be formed. At the present time there is no realization corporation in existence, and, as to the operating company, its affairs are now in the exclusive control of the Superintendent of Insurance as rehabilitator of Lawyers Mortgage Company, and they will continue to be so unless and until the plan receives sufficient assents to become operative. Any designations of voting trustees made at this time would, therefore, represent nothing more than expressions of the court's intentions in the event that the plan should be declared effective and become operative some time in the future. Changes of circumstances might well take place in the interim which would necessitate changes in the court's selection of the personnel who are to manage the affairs of the operating company and those of the realization corporation. Yet, if the court were to name the voting trustees now, the claim might later be made that those who assented to the plan did so in reliance upon the court's designating said individuals, and that, therefore, the court was estopped from refusing to appoint them regardless of the fact that there might be good reasons at the time for declining to do so. Under these circumstances the court is of the opinion that it would be impracticable and inadvisable to designate the voting trustees for the operating company or the realization corporation at this time.

No case has been called to the court's attention, nor does the court know of any, where individuals have been named to fill offices which did not exist at the time and which might never come into being.

Before concluding, the court wishes to comment briefly upon the prospect for the success of the operating company which, under the proposed plan, is to continue the mortgage business at present conducted by it under the control of the Superintendent of Insurance. The referee's report establishes that from the founding of Lawyers Mortgage Company in 1893 until the close of the year 1932 it showed continuous profits. The net earnings increased from $171,170 in 1903 to $2,611,662 in 1928, which was the year in which there were the largest net earnings for any one calendar year. From 1925 through 1931 the annual net earnings were over $2,000,000. During the thirty years from 1903 to January 1, 1933, the company enjoyed gross earnings of $54,252,215 and net profits of $32,364,208. The gross income from sources other than premiums and guaranties averaged nearly $2,000,000 per year for each of the five years ending on December 31, 1932. The company voluntarily adopted various safety limits prior to rehabilitation. For example, the amount of outstanding guaranteed mortgages was restricted to a maximum of twenty times the capital and surplus of the company. The principal amount of any mortgage guaranteed by the company was limited to a maximum of one-tenth of the company's capital and surplus. No mortgages were guaranteed by the company unless secured by real estate improved for business or residence purposes and unless the mortgage did not exceed two-thirds of the valuation of the property. Only five loans of $1,000,000 or more were made, the limitations above referred to precluding loans on the security of buildings of great height and mass, such as hotels, apartment houses, office buildings and buildings devoted to special uses. Up to December 31, 1932, the gross earnings and the net profits were large and the dividend distributions regular and liberal, while at the same time the company endeavored to adhere to its voluntarily adopted safety limitations. The referee's report states that "it would appear in the light of the record before me that the company's financial difficulties resulted from general economic conditions incident to the depression and not from the character of the management." (Referee's report, pp. 19, 20.) Since the Superintendent of Insurance took charge of the company for purposes of rehabilitation its activities have been necessarily limited to the servicing of the so-called old business of the company and the administering of the company's own assets. Even the servicing of the old business was

reduced to a very large extent by reason of the withdrawal of whole mortgages and certificated mortgages from the company by the owners of the whole mortgages and by trustees of the certificated issues. The Mortgage Commission, on behalf of the certificate holders of issues which had not been reorganized, also withdrew a very substantial number of certificated mortgages from the servicing of Lawyers Mortgage Company and its agent, Lawyers Mortgage Guarantee Corporation. On January 1, 1935, the outstanding guaranties of Lawyers Mortgage Company aggregated $428,075,536, while on May 1, 1936, the guaranteed mortgages and certificates serviced by Lawyers Mortgage Company or its subsidiary had been reduced to $100,100,367. The current liabilities of the company, according to the report of an examiner for the Insurance Department, exceed the current assets by many millions of dollars and, according to said examiner, the inability to meet " its current obligations as they arise is not of a temporary nature, for the reason that the current liabilities of the company are going to increase at a more rapid rate than the current assets."

Under the circumstances, the referee has properly come to the conclusion that " an emergence from rehabilitation is not feasible by reason of the increasing excess of current liabilities over current assets." He points out that " since it is neither safe nor feasible for the Company to emerge from rehabilitation, the alternatives are either reorganization or outright liquidation. Reorganization appears to me to be the sound alternative to adopt, provided the reorganization plan is feasible and equitable to creditors and stockholders. The record of the Company, its earning capacity during the years of normal operation, the possibilities of recouping business as a private enterprise, all point to the wisdom of continuing an operating company for the benefit of creditors and stockholders."

The court is in accord with the views thus expressed by the learned referee. Under the management of the able and experienced personnel of the old company, the troubles of which appear to have been due almost entirely to the economic depression rather than to inefficient management, the prospects for the success of the Lawyers Mortgage Guarantee Corporation should be extremely good. There is need for a well-managed mortgage company which may make building loans and engage in other safe and profitable activities, including the servicing of such loans and of mortgages on behalf of insurance companies, institutions and owners of mortgages generally. The operating company, it is anticipated, will use its facilities and best efforts to aid the holders of mortgages and certificates guaranteed by Lawyers Mortgage

Company in the refinancing of such mortgages and certificates, and it is further expected that a great many mortgages which have been withdrawn from the servicing of Lawyers Mortgage Company or its subsidiary will be returned to the operating company for servicing. It appears to be generally agreed that, freed from the liabilities and obligations of Lawyers Mortgage Company, the operating company should be able to conduct a successful mortgage business, the profits of which will be shared by the assenting creditors and stockholders in equal proportions.

Before concluding, attention should be called to a bill approved by the Governor a short time ago, the purpose of which is to permit reorganization of companies, such as Lawyers Mortgage Company, pursuant to statute. Heretofore, there being no statutory provision on the subject, reorganization could be accomplished only under the equity powers of the court along the lines followed in the plan of reorganization presently under consideration. The new statute enables a majority of creditors to bind a minority and enables the majority to deal more effectively with dissenters than was possible prior to the passage of the statute. The statute expressly provides that its enactment shall not, unless the court otherwise directs, affect any pending reorganization proceeding, and there is no reason, therefore, for modifying the proposed plan of reorganization at this time. However, in the event that efforts to obtain assents to the plan in sufficient number to enable it to be declared effective do not meet with success within a reasonable time, it may be necessary to resort to the provisions of the new statute in order to achieve a successful reorganization. Appropriate provisions to cover this contingency may be inserted in the order.

The motion to confirm is granted. Settle order.