In the Matter of the Liquidation of LAWYERS MORTGAGE COMPANY.*
Supreme Court, Additional Special Term, New York County, November 29, 1938.

* Affd., 256 App. Div. ——.

*Jacob L. Holtzmann*, attorney and special counsel for the Mortgage Commission.

*Edward F. Keenan* [*Samuel Boksenbom* of counsel], for the Superintendent of Insurance of the State of New York.

*McLanahan, Merritt & Ingraham* [*Scott McLanahan* and *H. B. Egginton* of counsel], for the reorganization managers.

*Cullen & Dykman* [*R. W. Crolly* of counsel], for the Brooklyn Trust Company.

*Pollock & Nemerov* [*M. J. Dix* of counsel], for C. Weingarten and others.

*Max J. Rubin*, for the Child Study Association of America and others.

*T. Keogh*, for Louis A. Green and others.

*Edward Endelman*, for various certificate holders.

*M. H. Blinken*, for Rozelle F. Oppenheimer, Yonkers Public Library and others. ;

*Evarts, Choate, Curtin & Leon* [*P. T. Morehouse* of counsel], for James Garretson, trustee for J. E. Spofford, and others.

*Winthrop, Stimson, Putnam & Roberts* [*E. Tinsley Ray* of counsel], for the stockholders' committee.

*Raphael H. Weissman*, for Herman H. Stone.

*Ehlermann & Crawford* [*Karl Ehlermann* of counsel], for the Fifth Avenue Bank of New York.

*Richard M. Page* [*W. B. Dungan* of counsel], for No. 435 North Twenty-fifth Street, Lincoln, Nebraska.

*James S. Kleinman*, attorney, in person.

*Leon Leighton*, for certificate holders and other creditors.

*Abraham N. Geller*, for various certificate holders and guarantee holders reorganization committee.

*Mitchell, Taylor, Capron & Marsh*, for the City Bank Farmers Trust Company.

*Cabell, Ignatius & Lown*, for the Buckner committee.

*Rapaport Brothers* [*Henry N. Rapaport* of counsel], for various creditors.

*Hoffman & Hoffman* [*Charles D. Hoffman* of counsel], for certificate holders.

*Weinstein & Levinson*, for certificate holders.

*Myron J. Kleban*, for Fay Kane and others.

*Morton E. Yohalem*, for Temple Emanuel, Central Hanover Bank and Trust Company, Hartford Fire Insurance Company and others.

*Wingate & Cullen*, for the City Bank Farmers Trust Company, as holder of certificates and trustee in various capacities.

*George C. Stephens*, chairman, guarantee holders committee of Lawyers Mortgage Company.

*M. B. & D. W. Blumenthal*, for independent guaranty mortgage certificate holders protective committee.

FRANKENTHALER, J. Six separate applications relating to the proposed reorganization of Lawyers Mortgage Company, hereinafter at times termed " the company," have been consolidated into one proceeding. In order to understand the nature and scope of these applications, reference must be made to the previous proceedings affecting the company.

On August 2, 1933, the company was placed in rehabilitation by order of this court, on application of the Superintendent of Insurance, and the latter was appointed rehabilitator. The order, pursuant to section 402 of the Insurance Law, directed the Superintendent to take possession of the property of the company and to conduct the business thereof, and " to take such steps toward the removal of the causes and conditions which have made such proceeding necessary " as the court might direct. The Superintendent was specifically authorized to adopt a plan of rehabilitation outlined in his petition and, in accordance with said plan, he caused a separate corporation to be organized, known as Lawyers Mortgage Guarantee Corporation, for the purpose of taking over the servicing and other functions previously performed by the company. " On May 11, 1935, Charles J. Mylod, then *Special Deputy Superintendent of Insurance* in charge of the rehabilitation of Lawyers Mortgage Company, caused a letter to be sent to certain of the larger creditors inviting them to attend a meeting to be held on May 23, 1935, *for the purpose of formulating a definite program for the reorganization of the company and considering a tentative plan of reorganization prepared on behalf of the Superintendent of Insurance,* the skeleton features of which were referred to in the letter." (*Matter of Lawyers Mortgage Co.* [*No. 2*], 158 Misc. 579, 580.) (Italics the court's.) At the meeting of May 23, 1935, a committee of creditors was designated to formulate a plan for the reorganization of the company.

When a tentative plan had been prepared the committee applied (1) for leave to intervene in the rehabilitation proceedings for the purpose of submitting for the court's approval a proposed plan of reorganization, annexed to the moving papers, (2) for the court's assumption of jurisdiction over the reorganization proceedings, and (3) for an order providing for hearings before a referee or otherwise, upon the " fairness and equitableness " of the proposed plan on notice to creditors, stockholders and other parties in interest. Counsel for the committee stated that the proposed plan was only tentative and " urged that an opportunity for a frank and full interchange of views be afforded to all those interested, to the end that a fair and equitable plan of reorganization might ultimately be worked out   *   *   *   *   *   *   *   *   *   *   *   *   *   counsel for the Superintendent of Insurance, although not in favor of the specific plan proposed by the committee, made the following statement: ' It is desirable that creditors have a chance to consider if they do want this very plan. If so, there is nothing more that can be said. It may be that this or some other plan that is more desirable will please them if this does not.   *   *   * Without giving the slightest encouragement to this particular plan, I think it can well be said that a plan of reorganization ought to be considered to the fullest extent before we are forced, as we will be if no plan of reorganization is formulated, to liquidation of the company.' " (Matter of Lawyers Mortgage Co., supra, p. 582.) (Italics this court's.) Counsel for the Mortgage Commission stated that it was " willing to follow the lead of the Superintendent of Insurance, on whom rests the duty of determining the question as to whether or not this plan or any other plan should or should not be promulgated." (Matter of Lawyers Mortgage Co., supra, p. 582.). " Not a single view to the contrary was expressed." (Matter of Lawyers Mortgage Co., supra, p. 583.) This court accordingly granted the motion to the extent of appointing a referee to conduct hearings on the plan proposed by the committee and such modifications or other plans as might be submitted for consideration. Shortly afterwards the Legislature, by chapter 729 of the Laws of 1936, amended section 30 of the Mortgage Commission Act (Laws of 1935, chap. 19) by adding a provision authorizing the Mortgage Commission " to intervene in any action or proceeding, involving the rehabilitation, reorganization or liquidation of any guaranty corporation." (Italics the court's.) (As will presently appear, the importance of this amendment is that it constitutes legislative recognition that a guaranty company could be legally reorganized at a time when no statute expressly authorizing the reorganization of companies under the jurisdiction of the Insurance Department was yet in existence.) The Mortgage Commission availed itself of the right

to intervene and has been an active participant in the reorganization proceedings ever since. After extended hearings, in the course of which twenty-three different proposed plans of reorganization were submitted and many amendments were suggested, the referee, under date of April 10, 1937, reported for the court's approval a plan of reorganization which, except in a few minor details, met with the approval of practically all the various parties in interest who had participated in the proceedings or who appeared at the hearing of the motion to confirm the referee's report and approve the plan recommended by him. (*Matter of Lawyers Mortgage Co.*, 163 Misc. 680, 683.) Counsel for the stockholders' protective committee said that the recommendation of the stockholders' protective committee to stockholders is, therefore, that they consent to and approve this plan. " ' It is a marvel that we have been able to get a plan which we can come with to your Honor and submit for your approval *with practical unanimity.*' " (Italics the court's.)

The court found that the proposed plan was fair and equitable to all concerned and that it met with the practically unanimous approval of all those who had indicated their views, including the Mortgage Commission. The referee's report was accordingly confirmed in July, 1937, and the plan approved by the court. The plan provides (for a comprehensive summary of its most important provisions see *Matter of Lawyers Mortgage Co.*, 163 Misc. 680) that when, in the opinion of the reorganization managers to be appointed thereunder, enough creditors and stockholders have assented thereto to make its consummation feasible, the reorganization managers shall apply to the court for an order declaring it effective. In no event, however, is such application to be made unless either the holders of two-thirds in amount of all outstanding guaranties or the holders of two-thirds in amount of the estimated allowable claims shall have assented to the plan.

While the motion to confirm the referee's report and approve the plan was pending, Governor Lehman signed a bill enacted by the 1937 Legislature and known as the Pack Act, adding article VIII-A to the Mortgage Commission Act (Laws of 1935, chap. 19). The resulting statute (Laws of 1937, chap. 926) took effect on June 6, 1937. It provides that a plan of reorganization of a guaranty corporation in rehabilitation on the effective date of the act shall become operative (1) when consented to by creditors holding seventy-five per cent of the claims against the company or (2) if the holders of more than fifty per cent of the claims shall have affirmatively assented and holders of less than twenty-five per cent of the claims shall have dissented within a time fixed by the court for the filing of dissents.

As this court pointed out in approving the plan in July, 1937, said statute did not *require* any modification of the proposed plan of reorganization *at the time*, although modifications might be necessary later on if the plan were brought under the statute. (*Matter of Lawyers Mortgage Co.*, 163 Misc. 680, 698.) "The statute expressly provides that its enactment shall not, unless the court otherwise directs, affect any pending reorganization proceeding, and there is no reason, therefore, for modifying the proposed plan of reorganization at this time. However, in the event that efforts to obtain assents to the plan in sufficient number to enable it to be declared effective do not meet with success within a reasonable time, it may be necessary to resort to the provisions of the new statute in order to achieve a successful reorganization. Appropriate provisions to cover this contingency may be inserted in the order."

It is important to note that the bill which, in amended form, became the Pack Act, was orig'nally prepared by counsel for the Mortgage Commission and was submitted by him, after it had been introduced in the Legislature, to the referee herein, before whom the hearings on various proposed plans of reorganization were being conducted, and to those attorneys who had been active in the present proceeding to reorganize Lawyers Mortgage Company. Amendments were made, one of which, prepared by counsel for the Mortgage Commission, recognized the court's right to consider any plans pending before it without resort to and independently of the proposed statute. With these amendments the bill became law. That the Legislature had in mind the possibility that those seeking to reorganize Lawyers Mortgage Company might require or avail themselves of the statute is evident from the provision of section 22-b that "The provisions of this act may upon order of the court be made applicable to any plan of reorganization or readjustment pending before the court or any referee appointed by it relating to any guaranty corporation which shall be in rehabilitation on the effective date of this act, *or as to which an order of liquidation pursuant to article eleven of the Insurance Law shall thereafter be made pursuant to any plan of reorganization pending on the effective date of this act before the court* or any referee appointed by it." (Italics this court's.) At that time the Lawyers Mortgage Company was in rehabilitation, and proceedings were pending for the adoption of a plan which provided for the entry of an order of liquidation *as the first step in the reorganization.* The referee had reported such a plan and the motion to confirm the same was pending before this court. It is, therefore, clear that section 22-b was deliberately phrased in language which would permit of no doubt as to its applicability to the present proceedings for the reorgani-

zation of Lawyers Mortgage Company. Subsequently, in accordance with the provisions of the plan, the reorganization managers appointed thereunder requested the Superintendent of Insurance to apply for an order of liquidation as the first step in the reorganization and the latter's application for that relief, in compliance with their request, was granted in November, 1937.

The order approving the plan of reorganization contained a direction that the reorganization managers named therein " examine into and consider the necessity for resorting to the provisions of Chapter 926 of the Laws of 1937 (commonly known as the Pack Act), for the purpose of achieving a successful reorganization herein, and to advise the Court thereof," and the court expressly reserved the right " to entertain any application that may hereafter be made to make the provisions of said Act applicable to the said plan and to make such order thereon as to the Court may seem just and proper." In May, 1938, the reorganization managers decided that it was desirable, for the purpose of achieving a successful reorganization as rapidly as possible, that the provisions of the Pack Act be made applicable to the plan of reorganization. They accordingly requested the Mortgage Commission, which is one of those empowered by section 22-b of the act to make the motion, to move " to make the provisions of said Act applicable to the plan of reorganization now pending before the court."

*The first of the six motions now before the court is the application of the Mortgage Commission to bring the plan of reorganization for Lawyers Mortgage Company under the Pack Act.*

Recognizing that the adoption of this course would necessitate certain modifications of the plan of reorganization in its present form, the reorganization managers simultaneously moved for an order approving a number of proposed amendments to the plan. *This is the second of the six motions previously referred to.* In their petition the reorganization managers state that as of June 1, 1938, they have received assents to the plan from holders of mortgages and mortgage certificates, guaranteed by Lawyers Mortgage Company, in the total face amount of approximately $155,000,000. This represents about sixty per cent of $256,060,000, the approximate aggregate principal amount (according to the supplemental affidavit of the Special Deputy Superintendent of Insurance in charge of the liquidation of this company) of the outstanding unreleased guaranties. In order to obtain the assents of holders of two-thirds in amount of all outstanding guaranties, assents amounting to about $15,710,761 additional were still required as of June 1, 1938. Additional assents aggregating substantially more than this amount have been obtained and filed with the

reorganization managers, so that at the present time the total assents received have gone beyond the two-thirds mark and the plan may, therefore, be declared operative. An affidavit filed by the reorganization managers, sworn to November 22, 1938, states that "The Reorganization Managers as of this date, November 22nd, 1938, have received and now have in hand assents to the Plan of Reorganization from 18,507 holders of such guarantees representing the total principal amount of $171,198,325.17, or $408,325.17 in excess of two-thirds of the total outstanding guarantees of the Company with respect to which claims have been duly filed with the Superintendent of Insurance."

The reorganization managers allege that they are informed that some fiduciaries, holding large amounts of outstanding guaranties, have not yet assented to the plan because of doubts entertained by them as to their legal right to do so. The managers believe that resort to the Pack Act is, therefore, advisable in order to expedite the receipt of assents from such fiduciaries. They point out that in preparing the amendments necessitated by the adoption of this procedure they have made as few changes as possible in the original plan, preserving " in substance the provision in said Plan that no petition for an order declaring the Plan effective shall be filed unless the holders of two-thirds in amount of outstanding guaranties shall have assented to the Plan, such provision being modified only to the extent of providing that no such petition shall be filed until the holders of not less than two-thirds of the aggregate amount of all claims of creditors which have been duly filed with the Superintendent of Insurance as Liquidator, shall have assented to the Plan." The provision of the original plan that only creditors and stockholders who affirmatively assent to the plan shall participate therein has been retained. An amendment insisted upon by the Superintendent of Insurance has been consented to by the reorganization managers and by the Mortgage Commission. It provides that creditors and stockholders who do not affirmatively assent shall retain their rights in the liquidation of the Lawyers Mortgage Company as conducted by the Superintendent of Insurance under article XI of the Insurance Law even though they fail to dissent from the plan. In other words, non-assenters are not bound by the plan and retain the rights they would possess if no plan were adopted. In order to adapt the plan to the provisions of the Pack Act, an amendment is proposed which provides that in determining the amount of the claims for the purpose of ascertaining whether the proper amount of creditors has proposed or approved a plan, the amount of each claim shall be measured in the manner prescribed by subdivision 1 of section 22-d of that statute, viz., " by

the obligation of the guaranty corporation as it appears on the books of the guaranty corporation, or shall be established by a sworn proof of claim, without deducting for the value of any collateral held by any creditor." The amendment continues as follows: " When creditors holding at least 75 per cent of all claims shall have affirmatively assented to this plan as hereinabove provided, the Reorganization Managers shall petition the Court for an order declaring the plan operative and effective. When creditors holding claims in the aggregate amount of more than 50 per cent but less than 75 per cent of all claims have assented to the plan as herein provided, the Reorganization Managers shall petition the Court upon notice to such persons as the Court may direct and as may be required by the provisions of Chapter 926 of the Laws of 1937, for an order fixing a time, not less than twenty days from date thereof, within which any creditor affected by the plan, and, if required by order of the Court any stockholder who shall not have assented thereto, may file a dissent therefrom and for the service of a copy of such order upon all interested parties by publication, mailing or otherwise as the Court may direct. If such dissents shall not have been filed within the time fixed by such order by creditors holding in the aggregate at least twenty-five per centum of the claims affected by the plan, or, if by order of the Court, stockholders shall have the right to dissent from the plan, no such dissent shall have been filed within said time by the holders of the aggregate of forty-nine per centum of the stock of the company then and in that event when the holders of not less than 66-2/3 per cent of the aggregate amount of all claims of creditors affected by the plan, shall have assented to the plan, the Reorganization Managers shall petition the Court for an order declaring the plan binding upon all parties affected thereby and operative and effective immediately upon the entry of such order."

Some of the suggested amendments have no connection with the application to bring the reorganization under the Pack Act. One of them provides for an increase of the authorized capital stock of Lawyers Mortgage Guarantee Corporation from 340,000 shares, each of the par value of $5, to 840,000 shares of the same par value and for an increase in the amount of the capital and surplus to be paid in by assenting creditors from $1,000,000 to $2,200,000, to be represented by 400,000 shares at a price of $5.50 per share; $2,000,000 is to be capital and $200,000 is to be surplus. The reason for this amendment is that the reorganization managers are of the opinion that a capital of $1,000,000 would be inadequate for the successful operation of Lawyers Mortgage Guarantee Corporation. Although it was originally expected that stockholders

assenting to the plan would also contribute $1,000,000 through new stock subscriptions, there is obviously no certainty of this occurring and the proposed increase of the amount of capital and surplus to be paid in by assenting creditors is intended to guard against the possibility that stockholders' subscriptions may fall below the original expectations. The amount of stock to which the stockholders of Lawyers Mortgage Company are given an opportunity to subscribe is likewise increased to $2,200,000, consisting of 400,000 shares at $5.50 per share. Another amendment requires the reorganization managers to give non-assenting creditors an opportunity to purchase stock in Lawyers Mortgage Guarantee Corporation, the purchase price thereof to be charged against the distributive shares which they are to receive as dividends from the proceeds of the Superintendent's liquidation of Lawyers Mortgage Company. Another amendment makes it clear that such fees, allowances and expenses of the reorganization as the court may approve shall be borne solely by creditors who assent or who buy stock (or the voting trust certificates to be issued in exchange for the stock) of Lawyers Mortgage Guarantee Corporation and by assenting stockholders of Lawyers Mortgage Company. During the course of the hearings on the six motions the reorganization managers and the Superintendent of Insurance agreed upon an additional amendment, the advisability of which was suggested by attacks made upon the validity of the Pack Act and questions raised as to whether the plan of reorganization could properly be brought under said act. This amendment reads as follows: " If Chapter 926 of the Laws of 1937, known as Article VIII-A of the Mortgage Commission Act, as amended, is not declared applicable to this plan or is declared inapplicable or invalid in any respect by the court, or any Appellate Court, this plan shall be and remain unaffected thereby." Other proposed amendments are of minor importance and need not be mentioned here.

*The third motion* is an application by the Superintendent of Insurance for an order approving a proposed sale by him, pursuant to the plan of reorganization, to the reorganization managers of all the outstanding stock of Lawyers Mortgage Guarantee Corporation for $2,200,000, conditioned upon the approval by the court of the amendments to the plan agreed upon by the Superintendent of Insurance and the reorganization managers, and conditioned also upon the plan's receiving sufficient assents to become operative and effective.

*The fourth motion* is made by the reorganization managers and seeks substantially the same relief as that which the Superintendent of Insurance applies for in the third motion.

*The fifth motion*, also made by the reorganization managers, seeks approval of a voting trust agreement and the designation of voting trustees thereunder. The plan of reorganization provides that the stock of Lawyers Mortgage Guarantee Corporation which is to be purchased from the Superintendent of Insurance by the reorganization managers is to be deposited with voting trustees under a trust agreement to be approved by the court. In anticipation of their success in obtaining enough assents to the plan to enable it to be declared effective, the reorganization managers have entered into an agreement with the Superintendent of Insurance to purchase all the stock of Lawyers Mortgage Guarantee Corporation, which agreement is sought to be approved on the third motion, and have also prepared the voting trust agreement which they are submitting for the court's approval. This is being done in compliance with the provision of the plan of reorganization authorizing the reorganization managers " to take such steps and to make such applications for the effectuation of the aforesaid reclassification, recapitalization, and exchange of stock for Voting Trust Certificates at the earliest feasible date in order that the Operating Company may commence activities under the control of the Voting Trustees provided for in the Plan at the earliest possible date."

The last of the six motions, made by a stockholder of Lawyers Mortgage Company, seeks (a) to vacate the order confirming the referee's report and approving the plan of reorganization recommended therein, and (b) to dismiss the reorganization proceedings, on the ground that they are unauthorized and illegal in that they violate the statutory requirement that the Superintendent of Insurance himself, and he alone, liquidate insolvent insurance companies under his jurisdiction.

Five of the six motions have been made by the Superintendent of Insurance, the Mortgage Commission and the reorganization managers. The only one made by any one else is the said application of a stockholder to vacate the order confirming the referee's report and to dismiss the reorganization proceedings. In view of the fact that such application questions the jurisdiction of the court over this entire proceeding, this motion will be taken up first. It is made on behalf of " Herman H. Stone, as trustee for Mildred S. Hilson, Mary E. Hilson and John S. Hilson." In his moving affidavit, sworn to July 26, 1938, Stone states that as trustee for the three Hilsons he is the owner and holder of 14,000 shares of the capital stock of Lawyers Mortgage Company, in liquidation. The total number of shares of capital stock of the company is 600,000 (report of referee). Stone's attorney, in response to questioning by counsel for the Superintendent of Insurance, stated

that the three Hilsons are the wife and two children of Mr. Edwin I. Hilson, one of the partners of an investment firm and that Mr. Hilson purchased the stock in question between August 5, *1937*, and February 25, *1938*. The agreement pursuant to which Mr. Stone became trustee was dated as of July 5, 1938, and the stock was presumably delivered to Stone on or after that date. On the very next day, July 6, 1938, the return date of the first and second motions aforementioned, made by the Mortgage Commission and the reorganization managers respectively: Stone's attorney entered an appearance and moved orally to dismiss the proceeding. Subsequently, on July 26, 1938, he renewed this motion in writing. (Herman H. Stone became the record owner of 100 shares of stock on February 3, 1938, but he is not the record owner of any stock as trustee for the three Hilsons named in his notice of appearance.)

An affidavit submitted by the Special Deputy Superintendent of Insurance in charge of the liquidation of Lawyers Mortgage Company reveals that in the spring of 1937, some time between the date of the referee's report in this proceeding (April 10, 1937) and the date of the court's decision approving the report (July 7, 1937), one Haas, an analyst and statistician employed by said investment firm, told him he had been asked by his firm to secure such information about Lawyers Mortgage Company *and its proposed plan of reorganization* as was available. The Deputy Superintendent gave him a copy of the referee's report and the statistical data he required. The Superintendent further states:" Some time after June 18, 1937, which was the date on which the Appellate Division, First Department, by a divided court, affirmed the decision of Mr. Justice FRANKENTHALER in the so-called Claims Formula case of the New York Title and Mortgage Company, Mr. Haas again called on me and stated that as a result of this decision and the dissenting opinions therein, Mr. Edward (*sic*) I. Hilson, one of the partners of Wertheim & Co., had become interested in the possibilities of the stock of Lawyers Mortgage Company and would like to discuss the matter with me." Shortly after this court approved the plan of reorganization, Hilson met the Deputy Superintendent of Insurance and discussed with him the possibilities of future operations of Lawyers Mortgage Guarantee Corporation *under the proposed plan of reorganization*. In addition the Superintendent states that Mr. Haas attended the argument on the claims formula in the Court of Appeals. He adds: " After the decision was rendered by that Court on January 25, 1938, and I should say within a week or two thereafter, I again conferred with Mr. Hilson, Mr. Haas and other gentlemen of Wertheim & Co., or representing them. The topic of discussion was the opinion of the Court of Appeals."

A number of conferences with Haas and Hilson took place during the winter and spring of 1937–1938, and Haas kept in touch with the Insurance Department as to the number of assents to the plan being obtained by the reorganization managers, as to the amount of claims filed against the company and as to proposed amendments of the plan. Late in the afternoon of July 5, 1938, the day before the return of the aforementioned motions to bring the plan under the Pack Act and to amend it accordingly, Haas informed the Insurance Department that Mr. Hilson had decided to intervene in the proceedings and would be represented by a named attorney, and on the next day, when this attorney appeared, " Mr. Haas telephoned me and I asked him who Mr. Stone was and he told me that he was an employee of Wertheim & Co. to whom certain shares of stock of Lawyers Mortgage Company had recently been assigned and delivered."

The Superintendent goes on to state that during the period within which Hilson's purchases were made the market price (over the counter) of the Lawyers Mortgage Company stock, of a par value of twenty dollars per share, varied from a high of one dollar and seventy-five cents per share and a low of one dollar per share in August, 1937, to a high of twenty-five cents per share and a low of ten cents per share in February, 1938. It appears from the record that if all the stock were purchased at the highest figure in each month it would have cost $21,218.75, and if at the lowest figure in each month $12,090. It is significant that, as indicated by the Superintendent's evidence, *all* Hilson's purchases were made after two justices of the Appellate Division, in a dissenting opinion (*Matter of New York Title & Mortgage Co.*, 251 App. Div. 415, 424–437), had expressed the view that the " real estate formula " rather than the " mortgage formula " should be employed in evaluating claims against mortgage guaranty companies, and *practically all* prior to the decision of the Court of Appeals on January 25, 1938 (277 N. Y. 66), which refused to adopt the theory of the dissenting justices that claims on mortgage guaranties should be fixed solely on the basis of the value of the underlying real estate and which approved the position taken by this court in the Additional Special Term and that of the majority opinion of the Appellate Division. Had the Court of Appeals approved the reasoning of the dissenting opinion in the Appellate Division the price of the stock of Lawyers Mortgage Company would probably have risen considerably, for the views expressed in that opinion would have benefited the stockholders in that a reduction of the claims of the creditors of the company would have resulted.

Although Hilson had purchased the shares of stock *after* the confirmation of the referee's report and the approval of the plan of reorganization, *and with full knowledge of the reorganization proceedings,* he waited approximately a full year, until the reorganization managers had succeeded in securing assents from holders of claims amounting to about $155,000,000, and were only about $15,700,000 short of the required sixty-six and two-thirds per cent (as previously pointed out, the shortage has since been eliminated by receipt of additional assents), and then for the first time questioned the validity of the entire reorganization. He raised no objection to the appointment of reorganization managers in September, 1937, or to the Superintendent's application in the fall of 1937 for the entry of an order of liquidation *as the first step in the plan of reorganization.* He remained silent while the reorganization managers bent every effort, for almost a year, in the securing of assents, incurring expenses, of which he now complains, in doing so. Only when the success of the reorganization seemed assured did this stockholder, who had knowingly and deliberately bought into the pending reorganization, endeavor to thwart the efforts of creditors and stockholders alike to bring about the reorganization of the once prosperous Lawyers Mortgage Company.

The general reaction of those at the hearings on the motion made on behalf of Hilson (or Stone) is expressed in the following statement made by Mr. G. C. Stephens, a certificate holder and chairman of the guarantee holders committee of Lawyers Mortgage Company: " As to Mr. Weissman's motion, your Honor, it seems a pity to me as a layman that anyone buying stock of the Lawyers Mortgage Company on the open market as late as this year, and only as far back as 1937, should come into court and cause all this expense to the creditors, all this unnecessary delay and expense. It seems to me it is a pity, aside from the law, your Honor, and you know I don't know a thing about law, but I hope you will bear in mind when you are considering this motion of Mr. Weissman, should it be so unfortunate that you have to grant it, I hope you will issue a censure to Mr. Weissman and his client to deter any others from coming in on similar proceedings, which to my mind, as a lay person, is almost disgraceful. * * * As to Mr. Weissman's motion, I hope your Honor will deny it on the ground that if you are business men sitting around this table, and here is a man who comes into court representing somebody that bought as a gamble, as a speculation, it is a shame that we creditors should have to pay the expense of such proceedings as this and the past hearing because people made a bad investment. They knew all about it. They knew the entire picture. They made a bad investment and they ought to

be good sports enough to say, ' Call it a day. It is all over.' That is what any group of business men would do. I venture to say that Mr. Weissman could not sit around a table with a group of business men and argue out a thing of this kind the way he has been doing. It is not fair for him to come in and tie up this proceeding which is costing the creditors thousands of dollars."

Except for an unsuccessful application by Fay Kane (*Matter of Kane*, App. Div. First Dept. N. Y. L. J. June 1, 1936, p. 2782), hereinafter referred to, not a single creditor has at any time during the proceedings expressed any objection to the validity of the reorganization proceedings and not a single stockholder other than Hilson (or his transferee, Stone) has indicated the slightest opposition. On the contrary, counsel for the protective committee of stockholders of Lawyers Mortgage Company expressly stated at one of the hearings: " We do not favor Mr. Weissman's motion *because we believe that all the benefits of a strict liquidation are preserved to any stockholder in this plan* as far as the assets which are not going into the operating company are concerned." (Italics this court's.)

.The motion to dismiss the reorganization proceedings is based upon the contention that " the purpose of the so-called reorganization proceedings is to transfer the liquidation of the estate from the Superintendent of Insurance " to those who are to manage the affairs of the " Operating Company " and the " Realization Corporation " under the plan. This, it is claimed, involves a violation of the Insurance Law which confers the power and authority to liquidate an insurer solely and exclusively upon the Superintendent of Insurance. In support of this position the movant cites the recent decision of the Appellate Division in *Matter of Lawyers Title & Guaranty Co.* (254 App. Div. 491), in which that court, two of the five justices dissenting, vacated an order appointing a referee in connection with a proposal to reorganize Lawyers Title and Guaranty Company. Leave to appeal to the Court of Appeals from this decision was granted by the Appellate Division on November 10, 1938 (255 App. Div. 1032; N. Y. L. J. Nov. 12, 1938, p. 1583). That case is, however, clearly distinguishable from the instant one. In the first place, a reading of the majority opinion reveals that the decision of the majority of the court was based upon the *factual conclusion* that the Superintendent of Insurance had opposed the reorganization. That opinion contains the statement (p. 494) that " the Superintendent may not be *compelled* to surrender his trust created by statute." (Italics this court's.) It goes on to intimate, however, that the situation would have been different if the Superintendent were participating in

and consenting to the proposed reorganization instead of opposing the same as an alleged interference with his statutory duties (p. 494): " He [the Superintendent of Insurance] may ask the help of the court in solving the problems which arise from time to time *but all propositions for the liquidation of the corporation must be approved by him.* The broad powers lodged in the Superintendent carry with them the grave responsibility of liquidating these companies in a proper manner. *There is nothing to prevent the Superintendent himself from negotiating with parties interested for the formulation of an approprate plan of liquidation,* and, when he has decided upon such a plan, it may be submitted for the approval or disapproval of the court." (Italics this court's.) The minority opinion, on the other hand, takes issue with the factual conclusion of the majority that the Superintendent of Insurance had opposed the court's assumption of jurisdiction over the reorganization proceedings. The dissenting justices found the fact to be that the Superintendent of Insurance had offered no opposition but, on the contrary, had conceded jurisdiction (p. 495): " In the circumstances here disclosed, the order of reference should not be vacated. The Superintendent of Insurance has at no time objected to the jurisdiction, and on the original motion at Special Term conceded the right of the court to act, reserving merely his right to reject, approve or disapprove of any ultimate action to be taken."

The majority opinion must necessarily be read in the light of the factual premises upon which it proceeds. Had the majority of the court intended to hold that under no circumstances may a guaranty company be reorganized, it would have been entirely unnecessary to consider the attitude of the Superintendent of Insurance and to emphasize that he, as the majority believed or found, had opposed the court's assumption of jurisdiction.

In the case at bar, however, as previously pointed out, the Superintendent has at all times favored and actively participated in the working out of a plan of reorganization. As stated at the very outset of this opinion, the original meeting *for the purpose of formulating a program for the reorganization of the company was called on May 11, 1935, by Charles J. Mylod, the then Special Deputy Superintendent of Insurance in charge of Lawyers Mortgage Company.* Ever since that time the Superintendent has exerted every effort in the same direction. So that there might be no misunderstanding as to the Superintendent's position in this case, the Superintendent's counsel has stated on the record that the Superintendent's position at all times during this proceeding has been " that so long as the plan was in the main a consensual purchase of assets by creditors

he had no objection to the plan; he thought it was fair to those creditors who preferred to participate in the assets in that way rather than receive dividends in the ordinary way in liquidation." He further stated: " The Superintendent feels that so far as the assenting creditors being able to buy the new company with $2,200,000 is concerned, there is no question about their ability, that is, that they have a sufficient interest in the estate to buy it, and there is no question about the Superintendent's willingness to sell it to them." He added, " We are now in a situation where $158,000,000 of creditors, Mr. McLanahan tells me, have assented to the plan. Irrespective of any legalistics, the Superintendent recognizes that sixty per cent of creditors have indicated their willingness to buy this stock and to participate in this plan, and the reorganization managers as assignees of those claims have indicated their willingness to buy the new company as recapitalized under the plan, and the Superintendent has agreed to sell it to them." *It is the Superintendent himself* who has made the application for the approval of the sale of the stock of Lawyers Mortgage Guarantee Corporation to the reorganization managers, this being one of the six motions now under consideration. The Superintendent has filed an affidavit in this proceeding in which he definitely states that he has " negotiated " the agreement with the reorganization managers. In answer to the charge of Stone's attorney that the application is not really the Superintendent's application, counsel for the Superintendent of Insurance said, " he apparently is making a point of it, that this really isn't the Superintendent's application, this isn't the Superintendent's sale. In that he is one hundred per cent mistaken. This is the Superintendent's application and this is the Superintendent's sale, upon the Superintendent's terms." The Superintendent went so far as to point out that even without any plan and without any Pack Act, he had told the reorganization managers that he was willing to sell Lawyers Mortgage Guarantee Corporation to them: " I want to make that quite clear, that the Superintendent told the reorganization managers in March that if they wanted to take their $130,000,000 — I believe they had at that time, of claims and forget all about the plan, forget all about the Pack Act, and simply say, ' We have got $130,000,000 worth of claims; we want to buy the new company,' the Superintendent would enter into this agreement for the sale of the new company. In other words, * * * the Superintendent feels * * * that even if Mr. Weissman's arguments are all right, all true, that the Pack Act is unconstitutional, illegal and what not, that the whole reorganization is illegal, the fact is that under this proceeding you have a syndicate of $158,000,000, and if the plan is declared

effective you will have a syndicate of at least $158,000,000, and the fact is that syndicate is a responsible buyer, sufficiently able as we will prove upon the return date, to pay and to secure for this stock."

It is clear from the foregoing that far from being compelled or forced to enter into the plan of reorganization, as the majority of the Appellate Division in *Matter of Lawyers Title & Guaranty Co.* (*supra*) stated, was the fact in *that* case, the Superintendent in the case at bar is himself asking that the reorganization and the sale thereunder be approved. Obviously, any provision in the plan for Lawyers Title and Guaranty Company which called for the Superintendent's sale of assets *against his will* would constitute a violation of article XI of the Insurance Law. No such situation is involved here, however, for the Superintendent wishes and desires to sell certain of the assets at a fair price, approved by the court, to the group of creditors and stockholders which has been formed under the plan and which is continuing to receive assents from additional creditors and stockholders.

That the consent of the Superintendent of Insurance or of the Superintendent of Banks (as the case may be) is a necessary prerequisite to the validity of a non-statutory plan of reorganization of an insurer or bank in his hands as rehabilitator or liquidator, *where the plan proposed interferes with the statutory duty of the Superintendent to liquidate,* has always been recognized. Thus, in the matter of the liquidation of Guaranteed Mortgage Company, an application by creditors for leave to submit such a plan of reorganization and for the assumption of jurisdiction by the court was denied (*Matter of Guaranteed Mort. Co.,* N. Y. L. J. Dec. 2, 1937, p. 1941), in view of the fact that the plan called for the taking of the liquidation of the company out of the hands of the Superintendent of Banks, who had taken over the company under the Banking Law, and the turning over of the liquidation to others. The Superintendent of Banks accordingly opposed the application, which sought to divest him, against his will, of his statutory right and duty to liquidate the company. A similar application by creditors of the State Title and Mortgage Company, looking toward the reorganization of that company, was withdrawn by the moving parties when upon the hearing the Superintendent of Insurance vigorously opposed the application. (See, also, to the same effect, *Matter of Lawyers Title & Guaranty Co.* [*Lemberg*], 165 Misc. 776, 780.)

That the majority opinion of the Appellate Division in *Matter of Lawyers Title & Guaranty Co.* (*supra*) has no application to the proceedings for the reorganization of Lawyers Mortgage Company

is also confirmed by the fact that the jurisdiction of this court to entertain *these very proceedings* for the reorganization of Lawyers Mortgage Company was unanimously upheld by the Appellate Division in *Matter of Kane (supra)*. There a creditor of the company applied to the Appellate Division for a writ of prohibition restraining this court from assuming jurisdiction of the reorganization proceedings and from taking any further action therein. One of the grounds of the application (to quote from the petition) was that " a feasible plan of reorganization is neither rehabilitation nor liquidation under the Insurance Law," and that, therefore, " the Supreme Court has no power to entertain a plan of reorganization." The Appellate Division denied the application for a writ of prohibition, thereby recognizing that the reorganization proceedings were within the court's jurisdiction.

Apparently recognizing that the plan of reorganization for Lawyers Mortgage Company cannot possibly be regarded as *compelling* the Superintendent of Insurance to do anything he does not wish to do, or as *substituting* the court's judgment for that of the Superintendent, or as interfering, contrary to the Superintendent's own desires, with his statutory duty to administer and liquidate the company's affairs, the movant argues that the plan is, nevertheless, illegal because " the Superintendent may not even *voluntarily* surrender his trust." The difficulty with this argument is that the plan of reorganization does *not* involve a surrender of his trust by the Superintendent. *In the absence of any plan of reorganization,* it is clear that no creditor or stockholder of Lawyers Mortgage Company would have any legal grievance or valid complaint if the Superintendent of Insurance, pursuant to section 421 of the Insurance Law, were to sell some or all of the assets of the company, including the stock of its subsidiary, Lawyers Mortgage Guarantee Corporation, at a price approved by the court as fair and reasonable. No one could successfully contend that such a sale would constitute a surrender by the Superintendent of his statutory duty to liquidate the affairs of Lawyers Mortgage Company, for the principal, if not the only, method of liquidating the company is through the sale and disposal of its assets, other than collectible debts. Section 421 expressly recognizes that this is so, for it provides that " The Superintendent may, subject to the approval of the court, (a) sell or otherwise dispose of the real or personal property, or any part thereof, of an insurer * * * and (b) sell * * * all doubtful or uncollectible debts or claims * * * owing to such insurer." The purchasers at such sale or sales, possessing, as they would, legal title to the purchased assets, could dispose of them as they might see fit without interference on the part of creditors

or stockholders of the company whose liquidator made the sale or sales. The rights of such creditors and stockholders would be limited and confined to the purchase price paid to the liquidator and they would be amply protected by reason of their right to receive their distributive shares of the price (and of the proceeds of the liquidation of the unsold assets remaining with the Superintendent). If, as has just been demonstrated, the Superintendent may sell all or some of the assets of an insurer of which he is liquidator at a price approved by the court as fair, without leaving himself open to the charge that he has surrendered his statutory trust, why may he not do the *very same thing* pursuant to a plan of reorganization which he himself has actively sponsored and pursuant to an agreement of sale which he, to quote from his own affidavit, sworn to August 18, 1938, has himself " negotiated?"

The sale which the Superintendent agrees to make of the stock of the subsidiary, Lawyers Mortgage Guarantee Corporation, is to be at a price approved by the court as fair. The sale or sales of other assets of Lawyers Mortgage Company by the Superintendent are likewise to be at a price and on terms *satisfactory to him* and approved by the court. The order of liquidation of Lawyers Mortgage Company, for which the Superintendent agreed, under the plan, to apply on request of the reorganization managers, could not be granted unless he established to the court's satisfaction the existence of proper grounds for the entry of such an order under section 403 of the Insurance Law. What happens to the assets (whether capital stock of Lawyers Mortgage Guarantee Corporation or other assets) after they have been sold by the Superintendent at a price approved by the court as fair is no legitimate concern of the creditors and stockholders of Lawyers Mortgage Company, their only right in such event being their right to receive their distributive shares of the price obtained by the Superintendent. The identity of the persons who are to manage the corporation or corporations which are to administer the purchased assets after the sale is likewise something which does not properly concern the creditors or stockholders of Lawyers Mortgage Company. The mere fact that various creditors have entered into a consensual arrangement, open to all other creditors, to bid for assets in the possession of the Superintendent of Insurance and to apply their distributive shares on the claims against the company held by them, to the payment of the purchase price, instead of paying cash, does not alter the situation and make that illegal which otherwise would be perfectly valid. It is to be noted that the creditors who choose to participate in the purchase of stock of Lawyers Mortgage Guarantee Corporation from the Superintendent are required by

the plan, in the amended form proposed, to pay interest at the rate of four per cent per annum on the amounts for which they are thus given credit, from the date of the purchase to the dates dividends are declared on their claims. (The corporation's present income is considerably less than four per cent per annum. As pointed out in the petition of the Superintendent of Insurance, dated July 22, 1938: " It will be some time before the claims are sufficiently determined in the Lawyers Mortgage Company to permit the declaration of a dividend to creditors. The assets of the Operating Company consist mainly of cash and United States obligations upon which the Superintendent can receive little return pending distribution to creditors. By the sale of this stock under this agreement, the Superintendent will receive interest at the rate of four per cent per annum from the date of sale to the date of payment and, if the stock is not previously paid for, to the date of the declaration of initial dividends in the liquidation of Lawyers Mortgage Company. Thus, the Superintendent will receive $88,000 a year in interest, which is substantially more than can be earned on $2,200,000 of cash and United States obligations held by the Superintendent pending distribution of dividends. The interest accrued on the purchase price to the payment thereof at four per cent per annum under this agreement, in the Superintendent's opinion, offsets any possible value of the stock in excess of the value of its tangible assets and makes the sale beneficial even to creditors and stockholders who do not take advantage of the offer to buy stock at the same price.") Any subsequent purchases of assets for the account of participating creditors other than for cash are to be simultaneous with a *pro rata* distribution of cash dividends to other creditors. All creditors and stockholders are given the opportunity of acquiring equal interests in the stock of Lawyers Mortgage Guarantee Corporation (which the Superintendent agrees to sell to the reorganization managers at a price approved by the court as fair and reasonable). Even creditors who do not otherwise participate in the plan are given the right to purchase interests in Lawyers Mortgage Guarantee Corporation at the same price and to the same extent and on the same terms as assenting creditors. Those creditors and stockholders who do not assent to the plan are not bound by its provisions and retain the identical rights they would have had were there no plan of reorganization, namely, the right to receive from the Superintendent of Insurance their distributive shares of the proceeds of the liquidation under article XI of the Insurance Law. When the provisions of the plan of reorganization are carefully analyzed it will readily be seen that the plan contains no provision which requires the Superintendent of Insurance to

do anything which he would not have the absolute right to do even if there were no plan. All that it does is give all creditors and stockholders an opportunity to unite in forming a group for the purchase of assets from the Superintendent of Insurance at prices which must be satisfactory to the Superintendent and which must be approved by the court as fair and reasonable to all concerned. Assenting creditors and stockholders are joining together for the purpose of acquiring certain of the assets in liquidation in order that they may utilize and dispose of those assets in a manner which they deem most advantageous to themselves. If absolute strangers may purchase the assets from the Superintendent, the right of creditors and stockholders to get together and themselves become the purchasers can be no less, especially where an opportunity to participate is given to all creditors and stockholders and those who do not choose to do so retain all the rights which would be theirs were there no reorganization. This view, as previously indicated, is shared by counsel for the stockholders' protective committee. Counsel for the reorganization managers expressed a similar view: " Now, why should the Reorganization Managers, merely because they have been appointed by a great majority of the creditors, be put in a worse position than an independent man in the street who has no connection with this proceeding whatever? He can walk in to the Superintendent and say ' Mr. Superintendent I would like to buy such and such a property. Will you please ask the Court for leave to sell it to me?' And if the Superintendent approves, he could do that. Now, to say that the Reorganization Managers must be put in a more unfavorable position, holding claims of the vast majority of these creditors, they must not ask the Superintendent to please sell or ask the Court for approval to sell, seems to me on the face of it a most extraordinary proposition, and this plan does not interfere with the liquidation by the Superintendent in the slightest degree."

The court is accordingly unable to perceive how the plan of reorganization may be said to call for an unlawful surrender by the Superintendent of Insurance of his statutory duty to liquidate. The plan *does* provide for liquidation *by the Superintendent* of part of the assets in one sale and for the further liquidation by him of various assets from time to time as steps in the reorganization, if, as and when he elects to sell. It contemplates, however, that, instead of selling assets to strangers, he will sell them to the creditors and stockholders of the company in liquidation, at least to those creditors and stockholders who wish to become purchasers. It is not the purpose of the plan to give such creditors and stockholders a bargain by letting them acquire the assets for less than they are

worth. The price, as repeatedly stated above, must be approved by the court as fair, just as if the sale were to outsiders. In fact, there is nothing in the plan which precludes the Superintendent of Insurance from selling the other assets to third parties if he elects so to do. As to the expenses of the reorganization, they are to be borne solely by the assenting creditors and stockholders and by creditors who purchase interests in the Lawyers Mortgage Guarantee Corporation, "the Operating Company" under the plan. As to the advances hitherto made by the Superintendent of Insurance to the reorganization managers, they will be amply secured by the Superintendent's right under the proposed amendment to deduct the amount of such advances from the dividends to be declared on the claims assigned to the reorganization managers. The Superintendent states that he will make no further advances unless and until the plan goes into effect. Sufficient assents to enable the plan to be declared operative having been received, the advances already made as well as future expenses will be chargeable only to the claims of assenters and no non-assenters will bear any part of them. It is, therefore, only in the event that the motion to vacate the order approving the plan and to dismiss the reorganization proceedings is *successful* that the movant, Stone, may be obliged to bear part of the advances. As was pointed out by counsel for one of the creditors, if Stone "was really concerned about the expenditure of $70,000, one would imagine that he would embrace this proceeding, which, with its amendments, provides that the assenting creditors are to restore that $70,000 to the estate; but he does not want that." (It is to be noted that under the provisions of the plan no fees or allowances may be made to counsel for creditors or stockholders or to committees of creditors or stockholders unless the plan is declared effective, and even in that event such fees or allowances are to be borne only by assenters.)

It is not, however, necessary to the validity of the proceedings that every act and step contemplated or provided for therein be one which could legally be performed even in the absence of a reorganization. If a plan of reorganization of a domestic insurer *is acceptable to the Superintendent of Insurance* and appears to the court to be fair and equitable to all concerned, it may be approved in the exercise of the court's inherent equity powers. Prior to the enactment in 1909 of section 63 of the Insurance Law (repealed by Laws of 1932, chap. 191, and re-enacted in art. XI of the same statute), the Supreme Court undoubtedly possessed the power of courts of equity generally to supervise and bring about the reorganization of corporations, *including insurance companies*, in proper cases. Unquestionably that power is still exercised by the court in

connection with corporations *other than banks and insurance companies.* (*Clinton Trust Co.* v. *142–144 Joralemon Street Corp.*, 237 App. Div. 789; *Chase Nat. Bank* v. *10 East 40th St. Corp.*, 238 id. 370.) In the *Chase Nat. Bank* case, while the dissenting opinion contained the statement (at pp. 377, 378):

" All the foregoing matters are outside the scope of an action in foreclosure, which in this State is controlled by specific statutory provisions. Among these is the express requirement that the sale be made to the highest bidder (Civ. Prac. Act, § 986). * * * If bondholders deem themselves aggrieved by a particular plan of reorganization, full relief may be obtained in an action in equity brought directly for that purpose.

" To permit the injection of such collateral issues in a foreclosure action where the right to a decree is not in issue, would directly violate clearly defined contractual rights, would complicate and delay the progress of the foreclosure action to an extent impossible to measure, and in addition possibly burden the property with greatly increased charges and expenses," it was evident that this was not the opinion of the otherwise unanimous court as indicated by the following language in the majority opinion (p. 375 *et seq.*):

" In the case of a strict foreclosure whereby the equity of the mortgagor is entirely wiped out, a comparatively simple problem is presented. Prior to 1899 it seemed to be the general impression that mortgage bondholders could combine with the stockholders of the corporation and readjust the entire property to suit themselves, to the extinction of all intermediary claimants and even to the injury of the mortgage bondholders themselves. Then came the leading case of *Louisville Trust Co.* v. *Louisville, etc., Railway* (174 U. S. 674, the *Monon* case). This decision of the United States Supreme Court held that with the large amount of the property involved or for other reasons, sales in foreclosure could not be expected to bring real competitive bidding, and that in such cases the foreclosure action *was only a step in a reorganization of the corporation.* * * *

" In *Clinton Trust Co.* v. *142–144 Joralemon Street Corp.* (237 App. Div. 789), Mr. Justice SCUDDER, writing for the Appellate Division, Second Department, on March 10, 1933, stated: ' The way is not unblazed if it be thought that we are pioneering in a new field. In the Federal jurisdiction it has been comparatively common for courts to take cognizance of reorganization plans in foreclosure and other suits, and to withhold judgment or confirmation of a sale until some fair and open plan of reorganization was presented and substantially agreed upon; and it has been said:

" A court of equity's modes of relief are not fixed and rigid. It can mold its remedies to meet the conditions with which it has to deal." (*Graselli Chemical Co.* v. *Ætna Explosives Co.*, 252 .Fed. 456, 459.) ' "

It has been common for the Federal courts to take cognizance of reorganization plans in foreclosure actions and in other actions and proceedings, and no valid reason exists for holding that our State courts may not exercise similar powers. As the Appellate Division in this department said in *Chase Nat. Bank* v. *10 East 40th St. Corp.* (*supra*, at p. 376): " Indeed, it seems to us absurd for the appellants to urge, as they do in this case, that the State courts are incapable of doing the same equity as have the Federal courts." After the appointment of a receiver in an equity action or proceeding the assets of the corporation would be *in custodia legis*, and, if the plan of reorganization approved by the court called for the sale of some or all of the corporate assets, the decree would direct the receiver to make the sale in furtherance and effectuation of the plan. *No valid reason exists for holding that a court of equity, though having the power to supervise and bring about the reorganization of financially embarrassed corporations generally, does not possess that power in the case of insurance companies or banks.* Nothing contained in section 63 or in any subsequent legislation purports to extinguish and destroy the court's previously existing power to approve plans of reorganization *for insurance companies.* Section 63 and article XI of the present statute, which took its place, as well as analogous provisions of the Banking Law, were not intended to make impossible the reorganization of delinquent or financially embarrassed domestic insurance companies and banks. There could be no sound reason for denying to insurance companies and banks the right to reorganize which all other classes of corporations, unaffected by the Insurance and Banking Laws, were concededly permitted to retain. The purpose of the amendments to the Insurance Law and the Banking Law which were adopted in 1909 and thereafter was merely to alter the theretofore existing methods for the *liquidation* of insurance companies and banks by substituting liquidation by the Insurance Department or the Banking Department, as the case might be, for liquidation by receivers appointed by the courts on the application of the Attorney-General. (See Report of Commission on Banks to Governor Hughes, submitted December 16, 1907; see, also, special message of Governor Hughes to the Legislature [Senate Doc. 132d Session, vol. 5, No. 26].) Analysis of the provisions of section 63 and of article XI discloses that it was not the legislative intent to substitute the Superintendent of Insurance for the courts in the handling of delinquent insurers.

but merely to deprive the court of the power to appoint persons other than the Superintendent of Insurance as receiver of such insurers, at the same time continuing the previously existing inherent general jurisdiction of the court. Article XI (as did section 63) contains repeated references to the necessity of the Superintendent's obtaining an order of the court or judicial approval as a prerequisite of his performance of various acts. Only nine of the twenty-nine sections now comprising article XI fail to mention the necessity of the Superintendent's obtaining the court's approval. The extensive nature of the court's power after the enactment of section 63 in 1909 is evident from the language of the Court of Appeals in *Matter of Casualty Co. of America (Rubin Claim)* (244 N. Y. 443), where Chief Judge CARDOZO, writing for the court, said (p. 449): " The power of the court to liquidate this claim and to direct its payment from the assets does not depend upon the power of approval reserved by subdivision 6 where the amount has been fixed by the liquidator through agreement with the creditor or with the creditor's consent. *The power is incidental to the supervision and direction of the course of liquidation* (§ 63, subd. 3). * * * Terms more distinct than any to be found in this enactment must stamp him [the Superintendent of Insurance] a judge before the courts will be shorn of the power of supervision that would otherwise be theirs." (Italics this court's.)

Even in the case of the Superintendent of Banks, over whose activities the court is not given the same degree of control as it is in respect of the Superintendent of Insurance (See 66th Annual Report of Superintendent of Insurance to Legislature; Beha [N. Y. Legis. Doc. (1925), No. 21, part I], for example, the Superintendent of Banks may take over a delinquent bank " forthwith " without an order of the court whereas the Superintendent of Insurance must apply for a court order), the Court of Appeals has said (*Isaac v. Marcus*, 258 N. Y. 257, 268, 269): " We have said that the Superintendent of Banks is in effect a statutory receiver, yet for some purposes the assets in his hands may be regarded as ' *in custodia legis* ' (*Lafayette Trust Co. v. Beggs*, 213 N. Y. 280). * * * There still remains a field within which the court is supreme. (See *Matter of Casualty Co. of America [Rubin Claim]*, 244 N. Y. 443.) "

If, despite the extensive powers vested in the Superintendent of Banks by the Legislature, the Court of Appeals nevertheless regarded the assets in his hands as being for some purposes " *in custodia legis,*" there is all the more reason for holding that the assets in the possession of the Superintendent of Insurance, whose powers and actions are subject to the constant supervision and direction of the court and less extensive than those of the Superintendent of Banks, are likewise *in custodia legis.*

In the recent case of *National Bondholders Corp.* v. *Joyce* (276 N. Y. 92) the Court of Appeals said (at p. 96): "It is a complete answer to this contention that a *court of equity, by virtue of its supervision over all phases of the liquidation of a financial corporation,* possesses full discretion to permit or deny an application for intervention. The conduct of the liquidation is subject in all its phases to the supervision and control of the court, except in so far as the Legislature may have vested discretionary power in the Superintendent. Save for this, the court in its discretion, may veto the acts of the Superintendent as liquidator, and is vested with a discretion which may override that of the Superintendent." (Italics this court's.)

That the purpose of article XI of the Insurance Law was not to prohibit reorganizations of delinquent insurers but, on the contrary, to encourage and promote such reorganizations, is confirmed by a report of former Superintendent of Insurance Van Schaick on "The Administration of the Delinquent Title and Mortgage Guaranty Companies by the New York Insurance Department," dated May 10, 1935, in which he states (at p. 4): "Article XI of the Insurance Law, drafted by Howard C. Spencer, counsel to the Department, assisted by others of the Liquidation Bureau, was sponsored by the Department of Insurance and was duly passed by the Legislature, approved by the Governor, and became effective March 15, 1932, superseding § 63. That Article changed completely the approach to the problem of the delinquent insurer and emphasized rehabilitation and conservation, rather than liquidation, in the belief that thereby an opportunity would be afforded to study the *possibilities of reorganization* and to consider how the substantial income-producing portions of the business of the insurer might be preserved as a going business for the benefit of creditors. Rehabilitation provided the necessary breathing spell during which the *status quo* was preserved, all persons were enjoined from asserting claims and a definite effort was made to explore *all the possibilities of reorganization.*" (Italics this court's.)

The enactment of section 63 and of its successor, article XI, although not intended or purporting to terminate the court's power to reorganize insurance companies, did, however, affect and alter that power in a very important respect. Whereas previously a court of equity could direct the receiver which it had itself appointed to convey the assets of the company in his charge in effectuation of the reorganization, after 1909 the court no longer possessed such *unrestricted* power in regard to insurance companies or banks. It could not direct the Superintendent of Insurance or the Superintendent of Banks to make a sale in furtherance of a plan of reorgani-

zation approved by the court, *unless the Superintendent himself was willing to do so,* for the power to liquidate and to make sales in the course of the liquidation was, after 1909, vested solely in the Superintendent, subject, however, to the court's approval. *To the extent, therefore, that a plan of reorganization for a bank or insurance company in the hands of the Superintendent of Banks or Insurance provided for a sale of some or all of the assets of the company the plan could not be consummated without the Superintendent's approval.* If a plan of reorganization made no provision for a sale, but merely contemplated the introduction of new capital and a recapitalization, the reorganization could proceed even though the Superintendent's approval was lacking (except where the Superintendent's approval was *otherwise* required by statute). Likewise, where the Superintendent approved the plan of reorganization which provided for his making a sale of assets in his possession, there was no valid reason for denying to the court the power to supervise and consummate the plan. Unless the court could validly approve a plan of reorganization for a domestic insurance company, promulgated by or acceptable to the Superintendent of Insurance, the latter, when placed in charge of such a company pursuant to the provisions of the Insurance Law, would be confronted with a choice of only two possible alternatives: (1) rehabilitation as defined in subdivision 3 of section 402, viz., the return of the assets to the original stockholders for the purpose of enabling them to resume the business and operations of the company, or else (2) liquidation. The first of these courses, rehabilitation, would, of course, be impossible where, as has generally been the case, the company is in such financial condition that it cannot resume business without substantial reorganization. The only other alternative, liquidation, would necessitate forced sales of assets at sacrifice prices and would often prove disastrous. It is impossible to believe that one of the objectives of the 1909 legislation or of the statutes which followed was to *forbid and prohibit* reorganization of domestic insurance companies and banks. If section 63 and article XI are given such a construction, even the enactment of the Pack Act has not materially affected the situation, for that act by its very terms is confined to guaranty companies in rehabilitation at the time it took effect and does not apply to guaranty companies in liquidation at the time or to other kinds of insurance companies such as life insurance companies, casualty insurance companies, fire insurance companies, etc. The disastrous consequences of interpreting the Insurance Law as limiting the Superintendent of Insurance to a choice between " rehabilitation " and " liquidation," in the narrow sense in which those words are

employed in the statute, must be evident when it is realized that since the 1929 depression commenced the Superintendent has taken over all or practically all of the mortgage guaranty companies in the State. The ultimate disposition of their assets was and is manifestly a matter of great import not only to their stockholders, creditors and policyholders, but also to the general public. Rehabilitation of these companies has proved impossible in almost every instance. Outright liquidation of the tremendously vast assets of the companies involved would have been seriously detrimental to the public interest. The Insurance Department has been fully aware of this situation and its implications and has actively encouraged reorganization of the companies wherever it thought such reorganization feasible. As early as August 30, 1934, Howard C. Spencer, counsel to the Title and Mortgage Rehabilitation Bureau of the New York State Insurance Department, at a meeting of the Section on Insurance Law of the American Bar Association, stated that " contrary to superficial impression the liquidation of the old company does not mark the end of possibilities of reorganization," and pointed out that even without legislation it was possible to effect reorganization by the device of a judicial sale:

" One type of reorganization centers about the device of judicial sale. After outstanding claims have been determined cash distribution of company assets cannot occur for a considerable time because many millions of dollars of these assets consist of mortgages and real estate which cannot be converted immediately into cash without substantial sacrifices. Under these circumstances perhaps when the time comes some form of mutualization of the companies to provide for a gradual, orderly liquidation may take place."

In the annual reports of the present Superintendent of Insurance, submitted for the periods ending December 31, 1935, and December 31, 1936, respectively, Superintendent Pink referred to the type of reorganization which requires no legislation to legalize it in the following language: " One type [of reorganization] accompanies and is a natural incident to the liquidation of these companies. When the company is placed in liquidation claims are comparatively quickly determined. At this point rights against the assets become known. In many cases, however, because of the lack of a real estate market, it will be years before these assets can be reduced to cash. In lieu of an indefinite postponement of distribution which would require the service of the Superintendent for many years as a liquidating custodian of the assets it may be possible to devise some distribution in kind by creating a liquidating corporation and distributing the stock to those entitled to it. This

places management of the assets into the hands of those who are chosen by the creditors. It is in one sense a mutualization of the old company. If the creditor-owners desire to have the company again engage in the mortgage business on a permanent basis, with or without new capital, they may, of course, do so provided they can qualify their institution under the then existing laws. This type of reorganization may be desirable, if the assets are frozen and it is not possible to pay reasonable cash dividends promptly, and the creditors prefer the management of the private group to that of the Department."

Although he took the position that he did not feel it incumbent upon himself to sponsor or propose such plans of reorganization generally on the ground that they were primarily the function of those who desired reorganization, he added: " When the Department is convinced that any plan thus proposed is fair and equitable and is desired by a substantial majority of the parties affected by the plan, it will give its approval and support to the proposal."

Nor are precedents lacking for the exercise by the court of the power to supervise the reorganization of domestic insurance companies, whether in rehabilitation or in liquidation   Such reorganizations have taken place during the last few years in the case of *Globe & Rutgers Fire Ins. Co.* (148 Misc. 497; Id. 501; 149 id. 16; Id. 18); *Matter of People* [*National Surety Co.*] (239 App. Div. 490; affd., 264 N. Y. 473) and *Matter of Union Guarantee & Mortgage Co.* (158 Misc. 565; 161 id. 882; 164 id. 606). In connection with the reorganization of *Globe & Rutgers Fire Ins. Co. (supra)* a bulletin issued by the New York State Insurance Department and printed in the *New York Law Journal* of November 27, 1934, (p. 2033), stated: " The rehabilitation provisions of Article XI of the Insurance Law, enacted in 1932, were resorted to rather than a liquidation proceeding in the hope that it might be possible to effect a *reorganization*. This hope has now been realized. * * * Throughout the rehabilitation proceedings the co-operation of the court has been of great assistance in enabling the Globe & Rutgers Fire Insurance Company to work out a *reorganization* plan." (Italics the court's.)

That the Legislature had no intention of prohibiting reorganization of insurance companies, that it did not intend to compel the liquidation of every insurance company which could not be rehabilitated (*i. e.*, returned to its stockholders for the resumption of business), and that it recognized that insurers might be reorganized *without express statutory authority*, is evident from the language and provisions of various statutes. Thus an amendment to the Mortgage Commission Act, enacted in 1936, gives the Com-

mission the right " to intervene in any action or proceeding, involving the rehabilitation, *reorganization* or liquidation of any guaranty corporation." (§ 30 as amd. by Laws of 1936, chap. 729.) (Italics the court's.) Even clearer evidence in the same direction is to be found in the provision of the Pack Act (§ 22-b), that it " may upon order of the court be made applicable *to any plan of reorganization or readjustment pending before the court or any referee appointed by it relating to any guaranty corporation which shall* be in rehabilitation on the effective date of this act, or as to which an order of liquidation pursuant to article eleven of the Insurance Law shall thereafter be made pursuant to any plan of reorganization pending on the effective date of this act before the court or any referee appointed by it. * * * *Unless, however, the court shall make such order, any plan pending before the court on the effective date of this act and any subsequent proceedings had thereunder, shall not be affected by the provisions of this article.*" (Italics this court's.)

Unless the reorganization of a delinquent insurer was possible prior to the enactment of the Pack Act, this provision would be meaningless. As no *statutory* provisions for reorganization existed up to that time, the Legislature could have been referring only to *non-statutory* reorganizations.

These are not the only instances of legislative recognition that the reorganization of a guaranty company under the jurisdiction of the Superintendent of Insurance may be accomplished *without resort to any statutory authority.* Thus section 406-b of the Insurance Law, enacted a year prior to the Pack Act by chapter 232 of the Laws of 1936, indicates clearly that the Legislature realized that a domestic insurer could be validly reorganized, although there was no statute then in existence which purported to authorize such reorganization: " In a proceeding for the rehabilitation, *reorganization* or liquidation *of a domestic insurer begun in this State,* claimants * * * shall file their claims in this State pursuant to the laws of this State." (Italics the court's.)

Section 406-a, enacted by the same chapter, declares it to be the legislative purpose " to promote uniformity in the rehabilitation, *reorganization* or liquidation of insurers doing business in more than one State." Even the preamble of the Pack Act contained in section 21 of article VIII-A, is worded in such a way as to indicate that the Legislature appreciated that domestic guaranty corporations " in rehabilitation pursuant to the provisions of article eleven of the Insurance Law " could be legally reorganized in *non-statutory* proceedings, for it states that " there is no *statutory* procedure now in existence for dealing with the problem of the companies " (italics this court's), and not that there is *no* procedure. All

that the enactment of the Pack Act did was to provide a *statutory* form of reorganization for *a limited class* of domestic insurers, namely, guaranty companies in rehabilitation (§ 22) or in liquidation pursuant to a plan of reorganization (§ 22-b), without affecting *non-statutory* methods for reorganizing *all classes* of domestic insurers, including guaranty companies but not limited to them alone.

In support of the motion to dismiss the reorganization proceeding, Stone's attorney has characterized the proposed sale of the stock of Lawyers Mortgage Guarantee Corporation as a pretended rather than an actual sale, claiming that there was no real negotiation and no exercise by the Superintendent of the discretion vested in him by statute. In answer to this contention, counsel for the Superintendent of Insurance pointed out that the sale was an actual sale which had been negotiated by the Superintendent in the exercise of his own free and independent judgment. He added: " The buyer here will pay four per cent a year on the purchase price until fully paid· for, with dividends. The Superintendent is frank to say that he has not been earning ·four per cent a year, and nobody will be able to earn four per cent a year as long as this company is going to retain United States Treasury Bonds. The people buying this company will have to take risks to justify this purchase, to justify the payment of the Reorganization expenses which are a premium on the stock, and the payment of four per cent a year, which is more than this company has ever earned or is able to earn on its investments."

Counsel for other creditors declared: " and when Mr. Weissman complains about this sale as not being a *bona fide* sale, his argument is reduced to the effect that were it not for this plan, there could be no such sale.

" That is granted. Granted that that is why there was a plan, just to make such a sale possible, if there had been no reorganization plan, there would have been no managers, and had there been no unified action, there would have been no purchaser, and if there would have been no purchase, the Superintendent never could have come into court with this application.

" Does that prove that the application is in bad faith?

" No, it proves it is not a sale to a stranger, it proves it is a sale to a group of creditors.

" Is it a fraud? Is the Superintendent not being paid? Is there any reasonable question about his security? Has there been an attack made upon the amount of the purchase price? Is anybody being hurt?

" Where are the elements that make it a fraudulent sale or anything but a perfectly *bona fide* sale to creditors who have finally succeeded in organizing themselves into a potential customer because they think they can get more out of it through that purchase than they could get through a purchase by someone else."

Nor is there any merit in the claim made on behalf of the movant, Stone, that it does not appear that the claims of assenting creditors will furnish adequate security for the purchase price to be paid to the Superintendent for the stock of Lawyers Mortgage Guarantee Corporation. Counsel for the protective committee of stockholders of Lawyers Mortgage Company expressly conceded that the claims of assenting creditors constituted ample security: " If the purpose [of introducing certain documents] is simply to show that the Reorganization Committee has enough claims and that probably,— not only probably but they surely have enough claims to justify them in bidding for the stock of the Lawyers Mortgage Corporation, the $2,200,000, why that fact, on behalf of my stockholders, I concede." This concession, it was pointed out by counsel for the Superintendent of Insurance, was against the interest of stockholders' counsel to make: " Mr. Roberts, representing a large block of stockholders, concedes that the assenting creditors have more than ample security for $2,200,000, and it is not to his interest or the interest of his client so to concede it." Quite apart from this concession, the evidence establishes clearly that the claims assigned to the reorganization managers by assenting creditors totaling more than $171,000,000 out of $256,000,000, the total aggregate principal amount of outstanding claims, furnish more than ample security that the Superintendent will be paid the purchase price for the stock of Lawyers Mortgage Guarantee Corporation which is to be sold to the reorganization managers. The assets in the hands of the liquidator exceed $14,500,000. The reorganization managers already hold more than two-thirds of the outstanding claims against the company. These claims will manifestly be entitled to receive a great deal more by way of dividends than the $2,200,000 to be paid for the stock, and the evidence of the Superintendent establishes this.

It follows that the motion to vacate the order confirming the referee's report and to dismiss the reorganization proceedings must be denied.

We now turn to the motion to bring the plan under the provisions of the Pack Act. The reorganization managers believe that the granting of this application would hasten the receipt of assents from fiduciaries holding large amounts of claims. The court is, however, of the opinion, as will now be pointed out, that there is an even better reason for granting the motion. If the plan is

brought under the Pack Act the arguments made in support of the motion to dismiss the reorganization proceeding would clearly fall without the necessity of analyzing the plan and demonstrating that it involves no surrender of or interference with the Superintendent's statutory duty to liquidate, and without the necessity of establishing that no statute is necessary to validate a plan of reorganization approved by the Superintendent of Insurance. The Pack Act being an enactment of the Legislature would, to the extent that it is inconsistent therewith, supersede the provisions of article XI of the Insurance Law conferring upon the Superintendent of Insurance the exclusive right to liquidate insurers under his charge as liquidator. The history of the Pack Act as well as its express language render it clear that it was intended to apply to the situation here presented. Section 22-b, as previously pointed out, provides that the court may, although it is not obliged to, declare the act applicable to a plan of reorganization of a guaranty corporation " *which shall be in rehabilitation on the effective date of this act, or as to which an order of liquidation pursuant to article eleven of the Insurance Law shall thereafter be made pursuant to any plan of reorganization pending on the effective date of this act* before the court or any referee appointed by it." (Italics this court's.) As counsel for the Mortgage Commission stated: " There is no other company in existence that could have been intended but the Lawyers Mortgage Company when this sentence was put into the law by the lawmaking body of this State." On the effective date of the Pack Act, June 6, 1937, Lawyers Mortgage Company *was* a guaranty corporation in rehabilitation and an order for its liquidation *was* thereafter made *pursuant to a plan of reorganization pending before the court on the effective date of the act.* No language could possibly be chosen which would more clearly fit the Lawyers Mortgage Company reorganization than that contained in section 22-b of the Pack Act. The argument that section 22-b of the Pack Act, entitled " Application to existing plans," was intended to refer only to plans of *rehabilitation* formulated by the Superintendent of Insurance under subdivision 3 of section 402 of the Insurance Law, for the purpose of enabling an insurer to emerge from rehabilitation and " *resume possession of its property and the conduct of its business,*" ignores the fact that section 22-b expressly provides that it shall be applicable even if the plan of reorganization or readjustment calls for the *liquidation* of the company and such order of liquidation " shall thereafter be made pursuant to any plan of reorganization." As an order of liquidation precludes the resumption by the insurer in rehabilitation of its property and of the conduct of its business, and as such an order may be granted in the case of a company in rehabilitation only if " further efforts

to rehabilitate" would be futile (Insurance Law, § 402, subd. 2), it must be evident that section 22-b of the Pack Act could not have been intended to refer only to plans of rehabilitation. An added difficulty with said argument is that it overlooks the history of the Pack Act, previously referred to, and the fact that the act was deliberately amended in order that it might be broad enough in its language to permit of its application to the plan of reorganization of Lawyers Mortgage Company. Nor is there any merit in the contention that "it is hardly conceivable that the Legislature could have intended to repeal so important a State policy as that adopted in 1909 for administrative liquidation by an inference from a procedural provision." In the first place, the authorization contained in the Pack Act to make it applicable to a plan for the reorganization of a company in rehabilitation, even though an order of liquidation pursuant to the plan is subsequently made, is expressed in the most unequivocal and positive language and is not at all left to inference. In the second place, no violation of the State policy embodied in the 1909 legislation is involved. That policy had for its aim and purpose the elimination of the serious delays and enormous waste connected with receiverships of both banking and insurance corporations and the substitution of "economical and speedy liquidation" by the Superintendent of Insurance and Banking. (Special Message of Governor Hughes to the Legislature, Senate Doc., 132d Session, vol. 5, No. 26.) "Because the system of liquidation by receivers 'had proved to be dilatory and wasteful' (*Matter of Casualty Co. of America* [*Rubin Claim*], 244 N. Y. 443), section 63 of the Insurance Law was enacted in 1909 ' to provide for an economical liquidation of insolvent insurance companies through the agency of a State department, and to prevent the waste of assets which theretofore had been occasioned through receiverships.' (*Matter of Knickerbocker Life Ins. Co.*, 199 App. Div. 503; appeal dismissed, 233 N. Y. 604.)" No administration of assets by receivers or by any one other than the Superintendent of Insurance is, however, provided for or contemplated in the plan. *The liquidation is to be conducted solely by the Superintendent and is to continue until concluded by him even if the plan of reorganization should become operative and go into effect in the meantime.* All that the plan accomplishes is to create a vehicle whereby assets which the Superintendent would otherwise, in the course of the liquidation, sell to strangers, may be purchased by those creditors and stockholders of the company who desire to do so. The price obtained must be satisfactory to the Superintendent and approved by the court and constitutes a part of the proceeds of the Superintendent's liquidation. Ultimately said purchase price and the other proceeds of the liquidation will be

distributed to creditors and, if there is any surplus, to stockholders. The purpose of the 1909 statutes was to protect the creditors and stockholders of insurance companies from wasteful receiverships imposed upon them, against their will, by the courts. To hold that creditors and stockholders may not themselves, *voluntarily*, band together in a syndicate and purchase assets from the Superintendent, as any outsider could, would be to discriminate against and injure the very persons whom it was the object of the 1909 legislation to safeguard and assist. The commendable efforts of the creditors and stockholders to work out a plan of reorganization of their own company, far from running contrary to the spirit and purpose of the legislation of 1909, conform with and carry out that very policy and purpose. As long as the conduct of the liquidation is to remain with the Superintendent of Insurance until completed, and as long as every creditor or stockholder can participate in the plan if he wants to, or, if he prefers, may stay out and retain all his rights, namely, the right to share in the proceeds of the liquidation according to the amount of his claim or the size of his stock holdings, there can be no foundation whatsoever for any contention that the policy of the 1909 legislation is being nullified or interfered with. The fact that the assets purchased by assenting creditors and stockholders may, under the provisions of the plan of reorganization, be managed and administered by trustees is wholly immaterial, for those assets after their purchase belong solely to the assenting creditors and stockholders who bought them and said assenting creditors and stockholders have an absolute right to decide for themselves how the persons who are to administer their own assets are to be chosen. The assets, after their sale to the group of assenting creditors and stockholders, belong solely to them, and are to be handled in accordance with their expressed wishes and desires. It is only as to what is done with the price received by the Superintendent for and in place of the assets sold by him that the courts retain the right of supervision (except, of course, that the plan itself may confer additional supervisory powers).

The argument has been made that the plan may not validly be brought under the Pack Act in view of the fact that upon the Superintendent's insistence it is to contain a provision that non-assenters shall not be bound and shall retain their right to share in the proceeds of the Superintendent's liquidation. Merely because the Pack Act *permits* the promulgation and approval of a plan of reorganization which shall, if it receives the necessary number of assents or if insufficient dissents are filed, be " binding upon all parties affected thereby " (§ 22-a), it is contended that a plan to be valid under the Pack Act *must* bind dissenters and

*may not* contain a provision that it shall bind only those who affirmatively assent. With this the court cannot agree. Although the Pack Act was intended to give assenters, where the assents reached a sufficient percentage or where the dissents fell below a specified percentage, the right, *if they chose to exercise it,* to bind non-assenters, it is unreasonable to impute to the Legislature the intention to deny to assenters the right to provide in the plan itself that non-assenters are not to be bound by its provisions. Nothing in the language of the act requires or points to such a construction. The act provides that the *plan* shall be binding, but does not say that the plan which is to be binding cannot itself contain a provision that it shall not affect non-assenters. The plan which is to be binding is the plan as it actually reads and with all its provisions, and that plan, in the case at bar, provides that non-assenters are to retain their right to share in the liquidation and are not to participate, unless they choose to, in the assets purchased from the Superintendent. The plan could not, it is true, validly provide that it should bind non-assenters even though it only receives a smaller percentage of assents than that prescribed by section 22-a. It can, however, properly provide that it shall not be binding unless it receives a *larger* percentage of assents than so prescribed, and it can with equal validity provide that non-assenters shall not be bound though it might legally contain a provision binding them. (Section 22-a, it is to be noted, states that the plan may be declared binding " upon all parties affected thereby," while section 22 of the act authorizes the plan to classify creditors and to provide that " any class of creditors shall not be affected by the plan." The present plan, in the amended form proposed, provides that creditors who do not assent shall not be affected by the plan. Although the court is of the view that even without these provisions of the statute and plan, the plan would be valid under the Pack Act, despite the clause that it is not to bind non-assenters, said provisions tend to confirm and strengthen the legality of the plan.)

Attack is also made upon the constitutionality of the Pack Act itself, it being charged that section 22-d prescribes an improper, arbitrary and unfair method of determining the amount of claims for the purpose of ascertaining whether a plan has received sufficient assents to enable it to be declared effective. If the plan in the case at bar were to bind non-assenters as well as assenters, it might perhaps be necessary to consider the merits of the criticism leveled at the provisions of section 22-d. The fact is, however, as repeatedly pointed out heretofore, that the plan of reorganization for Lawyers Mortgage Company does not bind non-assenters or affect their rights in the slightest and it follows that no constitutional or other right of non-assenters is invaded or infringed. In this connection

it might be well to recall that non-assenters are to bear no part of the expenses incurred in connection with the reorganization. These expenses are to be borne solely by those who participate in the plan. The advances made by the Superintendent of Insurance to the reorganization managers are to be repaid out of the dividends ultimately to be declared in favor of such assenting creditors. As counsel for the reorganization managers said: " I think that if the stockholder can show that he personally is being deprived of property without due process of law, if this plan goes through, as he alleges in his notice of motion, he might have some standing, but this plan expressly provides that the expenses for the consummation of the plan should be borne by those who participate. He does not participate. He is not charged with any of these expenses. He is not deprived of any property." The papers submitted by the Superintendent of Insurance establish clearly that the dividends to be declared in favor of assenting creditors will far exceed the amount of the Superintendent's advances. As non-assenters are not prejudiced, and as assenters are not complaining and obviously may not be heard to complain, no question of constitutionality is presented for determination.

Granting the motion to bring the plan under the Pack Act would enable it to receive whatever added validity may accrue to it as the result of its being expressly authorized and sanctioned by a specific act of the Legislature, without impairing in the slightest its validity as a non-statutory reorganization. This is so by reason of the proposed amendment, agreed upon between the Superintendent of Insurance and the reorganization managers, which the court approves, that " if chapter 926 of the Laws of 1937, known as article VIII-A of the Mortgage Commission Act, as amended, is not declared applicable to the plan or is declared inapplicable or invalid in any respect by the court, or any appellate court, this plan shall be and remain unaffected thereby." In other words, there is nothing to lose and everything to gain by bringing the plan under the Pack Act with said amendment incorporated therein. In order to be held invalid the plan would have to be declared illegal *both* as a Pack Act plan *and* as a non-statutory plan not under the Pack Act.

For the reasons indicated the motion to bring the plan under the Pack Act is granted. The motion to amend the plan so as to adapt it to the provisions of the Pack Act and also in other respects, some of which have been previously mentioned, is likewise granted.

The third motion, in which the Superintendent of Insurance seeks approval of the proposed sale by him to the reorganization managers of all the outstanding stock of Lawyers Mortgage

Guarantee Corporation for $2,200,000, conditioned upon the court's approval of the amendments to the plan agreed upon by the Superintendent of Insurance and the reorganization managers, and conditioned also upon the plan's receiving sufficient assents to become operative and effective, is likewise granted. The Superintendent, who has been operating the corporation for five years, is of the opinion, on the basis of the operating statements offered in evidence and his intimate knowledge of the corporate affairs, that the price to be received represents the fair value of the stock to be sold by him. As previously pointed out, he will receive under the agreement a considerably larger net return for some time to come than the assets to be sold have hitherto yielded. Nothing has been presented to the court to warrant any disagreement with these views of the Superintendent.

The fourth motion requires no discussion and is also granted.

The fifth motion for approval of the voting trust agreement is granted with such of the amendments proposed as have been consented to by the reorganization managers, except that the compensation of the voting trustees is not to be fixed by the operating company.

The court's disposition of all the six motions upholds the position taken by the Superintendent of Insurance, the Mortgage Commission and the reorganization managers. Thus a stipulation filed October 25, 1938, states that " The Mortgage Commission joins with the Superintendent of Insurance and the Reorganization Managers in requesting the Court to grant all of the pending applications of the Superintendent of Insurance and the Reorganization Managers, including the applications for approval of the agreement between the Superintendent of Insurance and the Reorganization Managers, and to make the Pack Act applicable to the Plan of Reorganization as so amended, and to deny the application of a stockholder to dismiss the reorganization proceedings.'

The plan of reorganization has been approved by the court after extensive hearings before a referee; it has received the affirmative approval and co-operation of two State agencies, the Superintendent of Insurance and the Mortgage Commission; no appeal has been taken from the order approving the plan; it has been expressly approved and accepted by over 18,500 holders of guaranties aggregating more than $171,000,000; it meets with the approval of creditors' and stockholders' committees; the only opposition to the reorganization has come at this time from a single stockholder whose stock, as previously pointed out, was recently acquired, during the pendency of the reorganization proceedings and with full knowledge of the details thereof.

Settle order.